**Sandra JARRELL et al., Plaintiffs,**

v.

**EASTERN AIR LINES, INC., Defendant.**

**Civ. A. No. 74–0353–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

March 3, 1977.

Kenneth V. Farino, Richmond, Va., Elizabeth R. Rindskopf, Atlanta, Ga., David R. Cashdan, Washington, D. C., Jeffrey Swope, Boston, Mass., Margie P. Hames, Mary Ann B. Oakley, Atlanta, Ga., for plaintiffs.

Francis V. Lowden, Jr., Hunton & Williams, Christine H. Perdue, Paul M. Thompson, Richmond, Va., Herbert Prashker, Gordon J. Davis, New York City, for defendant.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiffs, female flight attendants of the defendant Eastern Air Lines, Inc., bring this action under Title VII of the Civil Rights Act of 1964 to redress allegedly illegal employment practices. Plaintiffs seek declaratory, injunctive and monetary relief. Jurisdiction is attained pursuant to 42 U.S.C. § 2000e–5(f). A trial has been held, counsel have briefed the issues, and the matter is ripe for disposition.

### I. Findings of Fact

#### A. *Parties and Procedural Matters*

(1) Plaintiffs and intervenors in this litigation are all females who are or have been at times material to this action, employed by the defendant Eastern Air Lines, Inc., as flight attendants.

(2) The defendant is a Delaware corporation and has at all times material to this action, been an employer affecting commerce within the meaning of 42 U.S.C. § 2000e(b), (g) and (h).

(3) This action was filed in this Court as a class action under date of August 5, 1974 requesting relief under Title VII of the Civil Rights Act of 1964 with respect to the maintenance and enforcement by Eastern of a weight program applicable to its flight attendants.

(4) The case of *Comstock et al. v. Eastern Air Lines, Inc.*, C.A. No. C 75–576 A (N.D. Ga.) was filed as a class action in the United States District Court for the Northern District of Georgia under date of March 28, 1975 seeking the same relief as requested by the plaintiffs in the instant action.

(5) The case of *Hawks et al. v. Eastern Air Lines, Inc.*, No. 74–1857–M (D.Mass.) was filed as a class action in the United States District Court for the District of Massachusetts under date of May 23, 1974 requesting relief under Title VII identical to that sought by the plaintiffs in the instant case.

(6) The *Hawks* and *Comstock* actions were transferred to this Court for purposes of consolidation and pre-trial proceedings pursuant to an Order entered by the Judicial Panel on Multidistrict Litigation.

(7) After an evidentiary hearing, the Court denied the *Comstock* plaintiffs' motion for preliminary relief by Order dated May 16, 1975. The record of the preliminary injunction hearing was ordered to be included as part of the record in the instant action.

(8) Numerous motions to intervene in this action filed by flight attendants based at various bases were granted by the Court during various stages of the proceedings.

(9) On June 6, 1975, the Court tentatively declared this action to be a class action pursuant to Rule 23(b)(2), Fed.R.Civ.P. The class was defined as all female flight attendants employed by Eastern on or after June 4, 1971 who are or were subject to

Eastern's weight control program. On November 10, 1975, Notices of the Pendency of the Class Action in this case were mailed to all identifiable class members. Supplemental notices were mailed January 29, 1976.

■ (10) Shortly before trial, the plaintiffs moved to amend the complaint and redefine the class to include applicants for employment as well as incumbent flight attendants. This motion, which was denied by the Court at that time, has been renewed, and will meet the same fate as its predecessor motion.

(11) The trial of these consolidated cases was limited to the issue of liability.

B. *History of the Flight Attendant Position and the Weight Control Program*

(12) Eastern initiated an air hostess program in 1931 which lasted until March 1934 at which time it was phased out. It does not appear that the air hostesses were subject to a formal written appearance program. From March, 1934 until sometime in 1936, Eastern employed no flight attendants.

(13) From 1936 until the mid-1940's, Eastern's flight attendants (then called stewards) were exclusively male. Eastern resumed hiring female flight attendants (stewardesses) in the mid-1940's. Approximately 1958–59, Eastern ceased hiring male flight attendants. Male flight attendants who were already employed at that time were permitted to remain as flight attendants. Eastern did not resume hiring males as flight attendants until 1972. Since the mid-1940's, Eastern has employed both males and females in the category of flight attendant.

(14) For at least sixteen years, the position of flight attendant has been a predominantly female position. From 1970 through 1975, Eastern employed the following numbers of male and female flight attendants:

| Date | Females | % | Males | % |
|------|---------|---|-------|---|
| December 31, 1970 | 3,279 | 96% | 138 | 4% |
| December 31, 1971 | 3,109 | 96% | 125 | 4% |
| December 31, 1972 | 3,591 | 91% | 362 | 9% |
| December 31, 1973 | 3,856 | 90% | 446 | 10% |
| November 30, 1974 | 3,563 | 91% | 359 | 9% |
| December 31, 1975 | 3,945 | 90% | 445 | 10% |

(15) The hiring statistics for flight attendants from 1964 to 1974 are as follows:

| Year | Females | Males |
|------|---------|-------|
| 1964 | 471 | None |
| 1965 | 911 | None |
| 1966 | 829 | None |
| 1967 | 1,154 | None |
| 1968 | 1,459 | None |
| 1969 | 973 | None |
| 1970 | 493 | None |
| 1971 | 245 | None |
| 1972 | 908 | 255 |
| 1973 | 699 | 99 |
| 1974 | 69 | 14 |

(16) Eastern has never had a policy prohibiting the hiring or continued employment of married male flight attendants. Such policies have existed with regard to female flight attendants. The prohibition against continued employment for married female flight attendants was lifted in the early 1960's, while the ban on hiring married women as flight attendants remained in effect until 1971.

(17) Until 1970, Eastern terminated flight attendants who became pregnant. At that time, Eastern revised its policy so as to require pregnant flight attendants to stop flying upon knowledge of pregnancy and to permit their reinstatement 90 days after giving birth.

(18) A weight control policy has been a part of Eastern's general grooming standards applicable to flight attendants at least as far back as 1936. The pre-1969 standards were stated in terms of maintaining a weight in proportion to one's height. Enforcement of these pre-1969 programs was largely a function of supervisory personnel discretion. While the evidence is in conflict on this point, the more credible evidence supports a finding that females were more stringently subjected to the weight standards than were the male flight attendants.

C. *The 1969 and 1973 Weight Control Programs*

(19) In 1969, Eastern formalized its weight program for flight attendants by

defining for supervisors the procedures for enforcing the program and by listing for them charts which prescribed for given heights minimum and maximum weights for male and female flight attendants. The weight tables were as follows:

HEIGHT—WEIGHT CHART FOR FEMALE
FLIGHT ATTENDANT

| Height | Minimum Weight | Maximum Weight |
|---|---|---|
| 62" | 100 lbs. | 115 lbs. |
| 63" | 104 lbs. | 119 lbs. |
| 64" | 108 lbs. | 123 lbs. |
| 65" | 112 lbs. | 127 lbs. |
| 66" | 116 lbs. | 131 lbs. |
| 67" | 120 lbs. | 134 lbs. |
| 68" | 122 lbs. | 137 lbs. |
| 69" | 124 lbs. | 140 lbs. |

HEIGHT—WEIGHT CHART FOR MALE
FLIGHT ATTENDANT

| Height | Minimum Weight | Maximum Weight |
|---|---|---|
| 66" | 124 lbs. | 156 lbs. |
| 67" | 128 lbs. | 161 lbs. |
| 68" | 132 lbs. | 166 lbs. |
| 69" | 136 lbs. | 170 lbs. |
| 70" | 140 lbs. | 174 lbs. |
| 71" | 144 lbs. | 179 lbs. |
| 72" | 148 lbs. | 184 lbs. |
| 73" | 152 lbs. | 189 lbs. |

(20) The 1969 formal weight control program was implemented with the approval of Eastern's medical department. In the opinion of the medical department, the weight standards were not detrimental to the health of the flight attendants.

(21) The 1969 weight tables were based on those utilized by Trans World Airlines and which had been upheld in arbitration between Trans World Airlines and The Airlines Stewards and Stewardesses Association.

(22) As established under the 1969 weight program, flight attendants are to be weighed on a semi-annual basis. A flight attendant's maximum weight is either his or her chart weight or his or her hiring weight whichever is greater. The program is administered at each flight attendant base by personal appearance supervisors.

(23) If during the semi-annual weight check a flight attendant is found to be overweight, that flight attendant is placed on "weight check," and is required to report for weekly weight checks. Flight attendants can usually be weighed at their base before or after a flight.

(24) A flight attendant is not taken off the payroll for being overweight when he or she is initially placed on weight check. Under the 1969 program, incumbent flight attendants on weight check were required to show progressive decline in weight. The newly hired flight attendants (all of whom were female until 1972) were held to a more rigorous two pounds per week weight reduction schedule. In November of 1973, the weight reduction schedule for all flight attendants was changed to a rate of one-half (½) pound per week.

(25) Once a flight attendant has met the required weight, weekly weight checks are no longer required. Monthly weight checks, however, are required for three consecutive months.

(26) Flight attendants on weight check who fail to show the requisite weight loss are subject to suspension.

(27) Until changes in the program in late 1973, personal appearance supervisors placed flight attendants on "verbal" as opposed to formal weight check. Flight attendants on verbal weight check were not subject to suspension and no weight records were placed in their personnel file.

(28) Between April, 1969 and August, 1970, Eastern issued various administrative bulletins providing that no weight check should be performed during a flight attendant's menstrual period. In April, 1971, the guidelines were clarified to provide that a flight attendant should not be weighed five (5) days prior to or during her menstrual period.[1]

(29) In April, 1973, Eastern instituted a policy of allowing a five-pound waiver above a flight attendant's maximum weight before taking disciplinary action and allowing flight attendants to be weighed before

---

1. The weight program makes no allowance for weight gain due to pregnancy. Presently, Eastern does not permit pregnant flight attendants to fly. This policy is currently being litigated in a separate action. *Burwell v. Eastern Air Lines, Inc.*, 394 F.Supp. 1361 (E.D.Va.)

or after trips or at any other time within the weekly period.

(30) In November, 1973, Eastern revised its height/weight tables. The modifications included the elimination of the weight minimums, increasing allowable height by one inch for males, increasing maximum weights for taller females and issuing a number of administrative changes. The modified weight tables were as follows:

| Height | Female | Male |
|--------|--------|------|
| 62″ | 115 | — |
| 63″ | 119 | — |
| 64″ | 123 | — |
| 65″ | 127 | — |
| 66″ | 131 | — |
| 67″ | 135 | 156 |
| 68″ | 140 | 161 |
| 69″ | 145 | 166 |
| 70″ | — | 171 |
| 71″ | — | 176 |
| 72″ | — | 181 |
| 73″ | — | 186 |
| 74″ | — | 191 |

Weights are taken on a standard medical scale without shoes but with clothes.

(31) The November 1973 revised weight maximums were adjusted upwards for the female flight attendants in the three taller height categories as follows:

FEMALES

| Height | 1970 max. | 1973 max. | Change in Pounds |
|--------|-----------|-----------|------------------|
| 67″ | 134 | 135 | + 1 |
| 68″ | 137 | 140 | + 3 |
| 69″ | 140 | 145 | + 5 |

The November 1973 revised weight maximums for male flight attendants were adjusted downwards in all categories. In addition, Eastern added a new height category (74″) and weight maximum for that height (191 lbs.). The changes for males in November 1973 were as follows:

MALES

| Height | 1970 max. | 1973 max. | Change in Pounds |
|--------|-----------|-----------|------------------|
| 67″ | 161 | 156 | − 5 |
| 68″ | 166 | 161 | − 5 |
| 69″ | 170 | 166 | − 4 |
| 70″ | 174 | 171 | − 3 |
| 71″ | 179 | 176 | − 3 |
| 72″ | 184 | 181 | − 3 |
| 73″ | 189 | 186 | − 3 |
| 74″ | | 191 | |

(32) A flight attendant who believes his or her difficulty in complying with the weight program is the consequence of a medical condition may request an examination and consultation by Eastern's medical department. The medical department may grant the flight attendant an increase in the maximum weight in a number of pounds deemed appropriate. Flight attendants may also consult their personal physician and have a diagnosis and prognosis of their condition forwarded to Eastern's medical department for evaluation.

(33) Eastern by agreement with the Union, has suspended enforcement of the weight control program pending the outcome of this litigation. Eastern continues, however, to utilize its height/weight charts for the purposes of hiring flight attendants.

D. *The Weight Program on its Face*

■ (34) The Metropolitan Insurance Company Chart of Desirable Weights (Metro Chart) is broken down into frame sizes for each specified height. A simple juxtaposition of the Metro Chart with Eastern's weight tables reflects that Eastern's weight maximum for women generally falls within the medium and small frame categories and the weight maximum for men generally falls within the large frame size. The utility of this analysis is limited by the absence of a scientifically reliable means of measuring a person's frame size. This same limitation infects the comparison of Eastern's weight charts with other standardized height/weight charts. To the extent that frame size represents a normal pattern of weight distribution within a specified weight spectrum at a given height, the Eastern chart is drawn on a heavier end of the spectrum for males and the lighter end of the spectrum for females.

(35) The application of Eastern's weight tables to the general population of the United States between the ages of 25 and 31 would find a greater percentage of women than percentage of men to be in noncompliance. Approximately 33% of the female population of the United States could satisfy the 1969 chart while 33.3% could meet the demands of the 1973 standard. The percentage of complying males are 42.2%

**890**

and 43.5% respectively. There is no medical explanation for these statistics. The medical testimony adduced at trial satisfies the Court that weight is a characteristic which, within reasonable limits, is controllable by an individual.

(36) It is a statistical phenomenon that women gain more weight with age proportionately than do men. The Eastern program makes no accounting for age. There is, however, no medical reason for weight gain associated with age.

(37) On the average, men are taller and weigh more than women. On the average, men also weigh more than women of the same height.

### E. *The Weight Program as Applied*

(38) From 1970 to 1975, approximately the following number of flight attendants were disciplined under the weight control program:

| | | Male | Female |
|---|---|---|---|
| 1970 | Terminations | 0 | 1 |
| | Suspensions | 0 | 25 |
| | Reprimands | 3 | 56 |
| | Weight checks | 2 | 92 |
| 1971 | Terminations | 0 | 3 |
| | Suspensions | 0 | 43 |
| | Reprimands | 3 | 72 |
| | Weight checks | 4 | 131 |
| 1972 | Terminations | 0 | 2 |
| | Suspensions | 3 | 85 |
| | Reprimands | 12 | 211 |
| | Weight checks | 19 | 296 |
| 1973 | Terminations | 0 | 4 |
| | Suspensions | 2 | 81 |
| | Reprimands | 16 | 234 |
| | Weight checks | 23 | 241 |
| 1974 | Terminations | 1 | 1 |
| | Suspensions | 3 | 55 |
| | Reprimands | 28 | 253 |
| | Weight checks | 29 | 247 |
| 1975 | Terminations | 0 | 0 |
| | Suspensions | 2 | 17 |
| | Reprimands | 10 | 153 |
| | Weight checks | 13 | 145 |

(39) On a system-wide basis, the following represents the total number of disciplinary actions taken under the weight program from 1969 to 1975:

| | Male | Female |
|---|---|---|
| Terminations | 1 | 14 |
| Suspensions | 10 | 311 |
| Reprimands | 72 | 911 |
| Weight checks | 94 | 1,175 |

(40) With the ingenuity for which all good attorneys are noted, counsel for each side have cleverly dissected, examined, interpreted and reconstructed these figures to support their respective position. The Court concludes, however, that for the years 1970, 1971, 1974, and 1975, the plaintiffs have failed to establish any statistical pattern of discriminatory application of Eastern's weight program. The statistics simply do not reflect the disparate treatment of male and female flight attendants in either frequency or severity of discipline. Indeed, a shift of a mere one or two disciplinary actions from female to male flight attendants would indicate discriminatory enforcement against males. Such a difference is insignificant when viewed in the context of the thousands of flight attendants subjected to the program. The testimony of individual flight attendants and personal appearance supervisors, moreover, satisfies the Court that instances of unduly harsh enforcement were due to the inherent arbitrariness of the enforcement system rather than any sexually discriminatory policy. The Court additionally is satisfied that for the years heretofore mentioned, this inherent arbitrariness was not exercised to the discernible detriment of one sex or the other.

(41) For the years 1972 and 1973, the number of disciplinary actions taken against female flight attendants were greater in proportion to those taken against male flight attendants when compared with other years. The difference, however, between the percentage of female flight attendants subjected to a particular category of discipline during these years and the percentage of men so subjected never exceeded 3%.

(42) From 1968 to 1975, 162 female and 31 male flight attendants sought medical exemptions from, or medical consultations concerning, the weight program. Of these, 92 females received a total of 93 exemp-

tions and 54 females were denied exemptions. Twenty-two males were granted and 9 were denied exemptions. The remaining flight attendants (16 females and 1 male) consulted Eastern's medical department and either did not formally request an exemption or did not have these requests acted upon. It appears that virtually all of the requests for exemptions filed by male flight attendants were made subsequent to 1972. The Court is satisfied from Dr. Hudson's testimony and hence concludes that exemptions were granted or denied without regard to gender.

■ (43) Enforcement of Eastern's weight program is dependent upon the actions of its personal appearance supervisors. These supervisors candidly testified that they exercised a considerable degree of discretion in enforcing the program. In individual instances, this discretion was exercised in an arbitrary and inequitable manner. One such instance involved the plaintiff, Carmen Chardon, who was suspended for being ¼ lb. over her allowable maximum weight in January 1974. Why Eastern has declined to make full restitution to Ms. Chardon for this incident is not a justiciable concern of the Court. The Court is satisfied that the temporary suspension of Ms. Chardon was due to arbitrary enforcement rather than retaliation for her Union activity reference the weight program. The Court accepts the testimony of Elizabeth Ralph, the personal appearance supervisor involved in this particular incident, to the effect that she was unaware at the time of Ms. Chardon's Union affiliation.

■ (44) Ms. Jarrell's claim of retaliation is not supported by the evidence. She voluntarily resigned from her position with Eastern in 1971. The basis for her resignation was her opposition to Eastern's weight control program. Ms. Jarrell was considered to be an excellent flight attendant and her record noted that she was "recommended for rehire." In March of 1972, Ms. Jarrell filed a charge of discrimination against Eastern which gave rise to the instant action. She thereafter unsuccessfully sought to obtain reemployment with Eastern. The decision not to rehire Ms. Jarrell was due to her weighing in excess of the maximum hiring weight and because of poor attitude she displayed during her interview. Ms. Inga Berger, the Eastern employee who conducted the interview, found Ms. Jarrell to be defensive and hostile whenever the subject of the weight program arose. Ms. Berger had no knowledge of the EEOC charge and processed Ms. Jarrell's application in a routine manner. The administrative acceptance of Ms. Berger's recommendation was made by one unaware of Ms. Jarrell's challenge of the weight program.

## II. Discussion

■ The Court's ultimate determination in this cause involves a two-step analysis. First, the Court must determine, under the facts heretofore set out, whether sex discrimination within the meaning of Title VII of the Civil Rights Act of 1964 has been proven. If so, the Court must then proceed to determine whether the challenged practice can be justified by the defendant. *Earwood v. Continental Southeastern Lines, Inc.*, 539 F.2d 1349, 1350–51 (4th Cir. 1976). For the reasons which follow, the Court concludes that Eastern's weight program does not constitute sex discrimination, either on its face or as applied, and consequently, the Court need not address the issue of whether such a policy is justified by business reasons. *Earwood v. Continental Southeastern Lines, Inc., supra*, 539 F.2d at 1351 n.5.

That the weight program is a facet of an overall personal appearance policy applicable to flight attendants is acknowledged by all of the parties. There is virtual unanimity among the Circuit Courts of Appeals that an employer may impose reasonable personal appearance requirements upon its employees and such standards need not be identical for males and females. Such practices are said to be non-sexually discriminating. *See Earwood v. Continental Southeastern Lines, Inc., supra*, 539 F.2d at 1351 and cases cited at n.6. The plaintiffs' efforts to distinguish these so-called "hair-length" cases are not persuasive.

■ That Eastern has imposed weight limitations upon a predominantly female job classification, while relevant (*see, e. g., Laffey v. Northwest Airlines, Inc.*, 366 F.Supp. 763, 773–74 (D.D.C.1973), *aff'd in part*, No. 74–1791 (D.C.Cir. October 20, 1976)), is not dispositive. In *Earwood*, an employer was permitted to impose a more restrictive grooming code to the only job classification that was sexually segregated. Eastern's history of gender-based employment practices and its pre-1969 record of enforcing the weight program are surely not commendable. Eastern has, however, maintained a weight control program for flight attendants for over a 40-year period, including an era when the position was open only to men. Past discriminatory conduct, by itself, does not preclude an airline from later fashioning a nondiscriminatory weight program. *Laffey v. Northwest Airlines, Inc.*, No. 74–1791, Sl. Op. p. 46 (D. C.Cir. October 20, 1976). *Cf. Stroud v. Delta Airlines, Inc.*, 548 F.2d 356 (5th Cir. 1977).

The crux of the plaintiffs' position is that the standards applicable to female flight attendants are more stringent than those applicable to their male counterparts. This stringency, in the plaintiffs' view, is illustrated by the disproportionate exclusionary effect the weight charts would have if applied to the entire adult population in the United States. This inherent discrimination, plaintiffs submit, is exacerbated by the impact of aging on a woman's ability to maintain a given weight level. *See Meadows v. Ford Motor Co.*, 62 F.R.D. 98, 99 (W.D.Ky.1973) *mod.*, 510 F.2d 939 (6th Cir. 1975).

There are three difficulties with this analysis. First, the plaintiffs' statistical data reference weight patterns in the general population represents no more than a statistical phenomenon. There is no medical or physiological explanation for the purportedly greater exclusionary potential of Eastern's weight standards on women in the general population. Weight, unlike height, is a characteristic subject to the reasonable control of most individuals. *Cf. Boyd v. Ozark Air Lines, Inc.*, 419 F.Supp. 1061 (E.D.Mo.1976). Similarly, weight gain associated with aging can be reasonably controlled. In short, there is nothing inherent in womanhood which makes Eastern's weight standards more difficult for women to satisfy than men. To be sure weight control is not as simple as cutting one's hair. Nonetheless, the observations of Judge Butzner are appropriate here, "[d]iscrimination based on either immutable sex characteristics or constitutionally protected activities such as marriage or child rearing violate [Title VII] because they present obstacles to employment of one sex that cannot be overcome. On the other hand, discrimination based on factors of personal preference does not necessarily restrict employment opportunities and thus is not forbidden." *Earwood v. Continental Southeastern Lines, Inc., supra*, 539 F.2d at 1351.[2]

Secondly, the touchstone in most Title VII cases is the effect or impact of the contested employment practice upon the relevant class. *Gilbert v. General Electric Co.*, 429 U.S. 125, 162, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). Eastern's weight program has not produced any restriction in employment opportunities for women. Nor can the argument be made that the weight control program is a pretext for limiting employment to one sex. The flight attendant remains an overwhelmingly female dominated position. "The objective of Title VII is to equalize employment opportunities." *Earwood v. Continental Southeastern Lines, Inc., supra*, 539 F.2d at 1351. In light of the female dominance of the flight attendant position, the plaintiffs' attempt to prove discriminatory effect falls short. While the percentage of females subjected to disciplinary actions exceed that for males for the years 1972 and 1973, the Court concludes that the differences are not sufficiently great as to attain legal significance. *See Roman v. ESB, Inc.*, 550 F.2d 1343 (4th Cir. 1976) (en banc).

---

**2.** It appears that the arguments advanced by the plaintiffs have been accepted by one member of the Fourth Circuit Court of Appeals. See Judge Winter's dissent, *Earwood v. Continental Southeastern Lines, Inc., supra*, 539 F.2d at 1351–1353.

Finally, it must be emphasized that Eastern maintains a weight program for both men and women flight attendants. The standards adopted for both sexes are consistent with accepted medical notions of good health and may be complied with without imposing a health hazard. For those flight attendants who are medically unable to meet their chart weight, exemptions are available.

This Court is not so naive as to fail to recognize that Eastern's personal appearance standards, which include the weight control program, perpetuates certain sex stereotypes. Absent an accompanying gender-linked restriction on employment opportunities, such practices are not forbidden. *Earwood v. Continental Southeastern Lines, Inc., supra,* 539 F.2d at 1351.

In summary, Eastern's weight control program is imposed upon both male and female flight attendants. The difference between the standards for men and women are not unreasonable in terms of medical considerations and ability to comply. The differing standards have not had a disparate impact on the employment opportunities of women. Accordingly, the Court cannot conclude that the weight program is an illegal employment practice under Title VII, 42 U.S.C. § 2000e–2. *See Gerdom v. Continental Air Lines, Inc.,* No. 72–663–EC (C.D.Cal. September 23, 1976); *Cox v. Delta Air Lines,* No. 75–1639–Civ.–CA (S.D.Fla. September 30, 1976). *Cf. Woods v. Safeway Stores, Inc.,* 420 F.Supp. 35, 42–43 (E.D.Va.1976).

III.  Conclusions of Law

(1) The defendant, Eastern Air Lines, Inc., is an employer within the meaning of § 701(e) of the 1964 Civil Rights Act, 42 U.S.C. § 2000e(e) and is engaged in an industry affecting commerce within the meaning of § 701(h), 42 U.S.C. § 2000e(h).

(2) Jurisdiction of the Court is attained by virtue of 42 U.S.C. § 2000e–5(f).

(3) The burden of establishing by a preponderance of the evidence that a violation of Title VII of the 1964 Civil Rights Act has occurred rests with the plaintiffs. *Gilbert v. General Electric Co.,* 429 U.S. 125, 146, 97 S.Ct. 401, 51 L.Ed.2d 343 (Blackmun and Stewart concurring).

(4) The plaintiffs have failed to prove by a preponderance of the evidence that Eastern's weight program violates Title VII by discriminating on the basis of sex.

(5) The plaintiffs have failed to prove that by a preponderance of the evidence that Eastern's weight program has been discriminatorily enforced against females within time periods pertinent to this action.

(6) Plaintiff Ms. Jarrell has failed to prove her charge that she was the object of reprisals because she filed an EEOC charge against Eastern.

(7) Plaintiff Ms. Chardon has failed to prove by a preponderance of the evidence her claim that she was the object of reprisals as a consequence of her Union activities opposing the weight control program.

An appropriate order will issue.