604 F.2d 1028
 20 Fair Empl.Prac.Cas. 764,
20 Empl. Prac. Dec. P 30,218
CA 79-3151 Mary M. CARROLL, on behalf of herself and all
others similarly situated, Plaintiff-Appellant,
v.
TALMAN FEDERAL SAVINGS AND LOAN ASSOCIATION OF CHICAGO,
Defendant-Appellee.
 No. 78-1458.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 6, 1978.
Decided Aug. 21, 1979.
 
 Michael T. Welch, Winston & Strawn, Chicago, Ill., for plaintiff-appellant.
 Robert A. Deane, Chicago, Ill., for defendant-appellee.
 Before CASTLE, Senior Circuit Judge, CUMMINGS and PELL, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 Plaintiff's amended complaint was brought under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e Et seq.) on behalf of herself and all similarly situated female employees of defendant savings and loan association. The gravamen of the complaint was that defendant imposed a dress code on its female office employees without imposing a comparable dress code on its male office employees. Plaintiff moved for certification of her class and both parties moved for summary judgment. The district court did not certify a class because it granted the defendant's motion for summary judgment on the ground that its female dress code does "not prevent employment opportunity" under Section 703(a)(2) of Title VII (note 12 Infra ). 448 F.Supp. 79, 83. Since this case was based on Section 703(a)(1) (note 2 Infra ) rather than Section 703(a)(2), the employment opportunity test used by the district court was erroneous and requires us to reverse and remand.
 
 
 2
 Defendant requires all of its female tellers, office and managerial employees to wear a uniform, whereas male employees in the same positions need wear only customary business attire. This may consist of a suit, a sport jacket and pants, or even a "leisure suit," as long as it is worn with a shirt and tie. It is of course understandable that defendant wishes its employees to wear suitable business attire. However, the question before us is whether its one-sided rule requiring its 525 female employees to wear uniforms while there is no such requirement for its comparable 150 male employees[1] is forbidden by Section 703(a)(1) of Title VII of the Civil Rights Act of 1964.[2] By this rule defendant discriminated against plaintiff with respect to her "compensation, terms, conditions, or privileges of employment" because of her sex although such conduct is proscribed by the literal terms of that Section.
 
 
 3
 When the Equal Employment Opportunity Commission investigated plaintiff's complaint, it concluded that defendant's female dress policy constituted a "disparity in the terms and conditions of females as a class" and that possible customer preference for uniforms was "not a defense to an employment policy which makes a distinction upon grounds not permitted by Title VII" (P.App. 19). Therefore, the Commission tried to settle the matter and, when unsuccessful, issued a right-to-sue letter to plaintiff (P.App. 20), thus enabling this lawsuit to be filed.
 
 
 4
 The district court noted that the uniforms that females must wear consist of five basic items: a color-coordinated skirt or slacks and a choice of a jacket, tunic or vest (P.App. 94). As the reproduced photograph shows,[3] there is no question that the various combinations depict uniforms.
 
 
 5
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 6
 In contrast to the written uniform requirement for women employees, comparable male employees are permitted to wear business suits or business-type sport jackets and pants and ties (P.App. 21), and they are also permitted to wear leisure suits with a "suitable shirt and tie" (P.App. 36). Until 1968 they too were required to wear uniforms (P.App. 32).
 
 
 7
 The written dress code for female employees even discriminates with respect to their compensation, for defendant treats the cost of the two-piece uniform which it furnishes as income to women employees, withholding income tax on that amount from their wages (P.App. 91). In addition, the female employees are required to pay for the cleaning and maintenance of their uniforms "which must be clean and neat at all times" (P.App. 22). If a part of the uniform becomes lost or damaged, the employee must replace it at her own expense. Moreover, if an employee wishes additional parts of the uniform for variety or so that it can be cleaned more frequently than once a month, these extra pieces must also be purchased at her own expense. The written dress code for females also discriminates against them with respect to the "terms, conditions, or privileges of employment" because they are required to wear these uniforms each working day except the last Tuesday of each month, when they are normally being cleaned, and during the week between Christmas and New Year's (P.App. 21, 67, 94). As in plaintiff's case, defendant suspends employees if they do not conform to the dress code (P.App. 25).
 
 
 8
 Laffey v. Northwest Airlines, Inc., 366 F.Supp. 763 (D.D.C.1973), vacated and remanded in part and affirmed in part, 185 U.S.App.D.C. 322, 567 F.2d 429 (1976), certiorari denied, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792, sets the stage for the proper disposition of this dispute. There the district court held that an airline's ruling forbidding female cabin attendants to wear eyeglasses violated Section 703(a)(1) of Title VII (366 F.Supp. 763, 790), and the airline did not appeal from that aspect of this decision. See 567 F.2d at 454, n. 170. However, the court of appeals affirmed the district court's comparable holding that inferior pay scales and weight limitations imposed upon stewardesses as compared to stewards (then known as pursers) violated Title VII. Because of this holding the court of appeals obviously would have agreed with the district court's rulings that the airline had violated the stewardesses' statutory rights by prohibiting them from wearing eyeglasses, requiring them to purchase prescribed luggage, and imposing on them a shorter height limitation than on stewards.[4]
 
 
 9
 The dissenting opinion of Judge Pell characterizes both the male and female dress codes as resulting in ordinary business attire and concludes that the two rules are only semantically different. However, it is the compulsion to wear a uniform which by its color, cut and homogeneity is clearly identifiable with the employer that evinces the discriminatory nature of the written dress code for females.[5] The dissent relies on the fact that the female uniforms are not "unattractive in style, inferior in quality, ill-fitting, or uncomfortable such that they would cause embarrassment or be considered demeaning," but that is no answer to the discrimination involved.[6] Finally, the dissent relies on the fact that the female dress code "did not Substantially burden the female employees more than male employees in the enjoyment of their jobs" (emphasis supplied), but that is not the criterion imposed in Section 703(a)(1) of the Act, for that Section was "intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." Sprogis v. United Air Lines, 444 F.2d 1194, 1198 (7th Cir. 1971), certiorari denied, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543.[7] Also, it is immaterial that some of the female employees favored the uniform dress code because, as Justice Stevens stated in Los Angeles Dept. of Water & Power v. Manhart, 435 U.S. 702, 707, 98 S.Ct. 1370, 55 L.Ed.2d 657, Section 703(a)(1) makes it unlawful to discriminate against any individual because of such individual's sex. He added:
 
 
 10
 "The statute's focus on the individual is unambiguous. It precludes treatment of individuals as simply components of a racial, religious, sexual, or national class. If height is required for a job, a tall woman may not be refused employment merely because, on the average, women are too short. Even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply.
 
 
 11
 "Even if the statutory language were less clear, the basic policy of the statute requires that we focus on fairness to individuals rather than fairness to classes." (435 U.S. at 708, 709, 98 S.Ct. at 1375-1376.)[8]
 
 
 12
 Section 703(e) of the statute permits sex discrimination in employment where sex "is a bona fide occupational qualification reasonably necessary to the normal operation" of the particular business (42 U.S.C. § 2000e-2(e)). However, defendant does not rely on a "BFOQ" defense nor does defendant rely on any business necessity for this dress code (Br. 53-54). Instead its defense is that its dress code, if discriminatory, was job-related or reasonably necessary to the proper operation of its business (Br. 55, 57). But the courts have only permitted a stricter "business necessity doctrine" as an exception to Title VII,[9] and defendant has not attempted to justify the female dress code on the ground of business necessity (Br. 46-57).
 
 
 13
 As plaintiff has pointed out, defendant has several permissible alternatives to the present discriminatory dress code. Thus it could legitimately require women to wear "appropriate business attire" while at work, as in the case of the men employees,[10] or it could make the uniform optional to women employees.[11] Otherwise it could require comparable male employees to wear some sort of uniform while at work, as they did between 1958 and 1969, and as numerous other banks and savings institutions do. Title VII does not require that uniforms be abolished but that defendant's similarly situated employees be treated in an equal manner.
 
 
 14
 The employment opportunity grooming cases relied upon in the dissent and by defendant do not apply to the present situation, for this is a Section 703(a) (1) case rather than one brought under Section 703(a)(2)[12] which alone requires deprivation of employment opportunities in order for a classification based on sex or another prohibited basis to be held illegal.[13] Nashville Gas Co. v. Satty, 434 U.S. 136, 144-145, 98 S.Ct. 347, 54 L.Ed.2d 356.
 
 
 15
 Fountain v. Safeway Stores, Inc., 555 F.2d 753 (9th Cir. 1977), relied upon by the district court (448 F.Supp. 79, 81), found no violation of Title VII in Safeway's requirement that male employees wear a tie, but in Fountain the court merely held that "Safeway may promulgate different personal appearance regulations for males and females * * * " (55 F.2d at 756). Similarly, in Fagan v. National Cash Register Co.,157 U.S.App.D.C. 15, 481 F.2d 1115 (1973), also relied upon by the district court, an employer's rule regulating hair length for men was held to be non-discriminatory.[14] The Fagan court commented
 
 
 16
 "reasonable regulations prescribing good grooming standards are not at all uncommon in the business world, indeed, taking account of basic differences in male and female physiques and common differences in customary dress of male and female employees, it is not usually thought that there is unlawful discrimination 'because of sex.' " (157 U.S.App.D.C. at 17, 481 F.2d at 1117, n.3.)
 
 
 17
 We share the reluctance of the courts in Fountain and Fagan to pass on whether a particular personal appearance regulation promulgated by an employer is "reasonable." So long as they find some justification in commonly accepted social norms and are reasonably related to the employer's business needs, such regulations are not necessarily violations of Title VII even though the standards prescribed differ somewhat for men and women.[15] However, the situation is different where, as here, two sets of employees performing the same functions are subjected on the basis of sex to two entirely separate dress codes one including a variety of normal business attire and the other requiring a clearly identifiable uniform. This different treatment in the conditions of employment for female employees cannot be justified by business necessity, since, as already described, the employer had a variety of non-discriminatory alternative means of assuring good grooming. Moreover, the disparate treatment is demeaning to women. While there is nothing offensive about uniforms Per se, when some employees are uniformed and others not there is a natural tendency to assume that the uniformed women have a lesser professional status than their male colleagues attired in normal business clothes. The employer's stated justification for the policy is that
 
 
 18
 "dress competition among women is reduced and they do not have to be concerned about wearing something that is appropriate business attire because the career ensemble[16] is acceptable. (D)ress competition exists among women employees on glamour days (b)ut in the case of men employees there is little difficulty getting them to adhere to the dress and grooming code requirements. And there is little dress competition among male employees * * *." (Br. 5-7.)
 
 
 19
 Furthermore, counsel for defendant commented at oral argument that although the defendant trusts the business judgment of its female employees,
 
 
 20
 "the selection of attire, of clothing on the part of women is not a matter of business judgment. It is a matter of taste, a matter of what the other women are wearing, what fashion is currently. When we get into that realm * * * problems develop. Somehow, the women who have excellent business judgment somehow follow the fashion, and the slit-skirt fashion which is currently prevalent * * *. They tend to follow those (fashions) and they don't seem to equate that with a matter of business judgment."
 
 
 21
 Clearly these justifications for the rule reveal that it is based on offensive stereotypes prohibited by Title VII. As Judge Pell wrote for this Court in In re Consolidated Pretrial Proceedings in the Airlines Cases, 582 F.2d 1142 (7th Cir. 1978), the proffered justification
 
 
 22
 "relies heavily on stereotypical assumptions, a posture which is anathema to the maturing state of Title VII analysis.
 
 
 23
 "(A)ssumptions steeped in cultural stereotypes * * * are inconsistent with the purposes of the Act." (582 F.2d at 1146-1147).[17]
 
 
 24
 It should be noted that when plaintiff did not wear the uniform, the district court found that she appeared at work "dressed in appropriate business attire" (P.App. 96). Moreover, defendant's personnel manager admitted that during the times they were not required to wear uniforms, namely on the last Tuesday of every month and during Christmas week, these female employees never wore "improper business attire" (P.App. 82-83).
 
 
 25
 With all due respect to the views of a valued colleague, Judge Pell's dissenting opinion favors affirmance mainly because the sex discrimination here is not blatant. However, Section 703(a)(1) prohibits any sex discrimination with respect to compensation, terms, conditions, or privileges of employment (note 2 Supra ). Hence we reverse the judgment below and remand for class determination and entry of summary judgment for plaintiff, affording her whatever relief the district court considers appropriate after careful consideration of her six relief prayers (P.App. 11-13).
 
 
 26
 Reversed and remanded with directions.
 
 
 27
 PELL, Circuit Judge, dissenting.
 
 
 28
 With this decision of this court, Big Brother or perhaps in this case, Big Sister has encroached, in my opinion, farther than the Congress intended or authorized into the domain of private enterprise, or what remains of that concept, not for the purpose of assuring clean or safe, or even enjoyable, working conditions on an equality of sex basis, nor for the purpose of guaranteeing fair, adequate or equal compensation, but simply to respond to the emotional complaint of one disgruntled employee who purported to claim, without any support in the record, that she represented the thinking of a class of employees. I therefore respectfully dissent.
 
 
 29
 The majority opinion categorizes the clothing women are required to wear at work as uniforms but refers to that which men must wear as customary business attire. These characterizations ignore the fact of life that men's customary business attire has never really advanced beyond the status of being a uniform. True there have been variations from time to time probably mainly attributable to the desire of the clothiers to stay in business there have been wide and narrow lapels, cuffed and cuffless trousers, different colored shirts which are ordinarily substantially covered by jackets, some splashes of color in neckties, a choice of four-in-hands or bowties, non-vested and vested suits,[1] a choice of belted or beltless or suspender-supported trousers, ankle-length or over-the-calf hosiery, pleated and non-pleated trousers, three button or two button jackets and even occasionally in daring moments a pleated-back jacket. In the most innovative soaring from the nest of uniformity that I can recall in recent decades someone introduced the so-called leisure suit which upon any fair analysis itself resembles a uniform. Men, of course, do have a choice of materials and colors in their suit, or sport jacket and slacks outfits, but I am not aware that lurid colors would qualify as "customary business attire," any more than would one of the bizarre assemblages worn by a modern rock singer.
 
 
 30
 On the other hand, women have had a wide range of non-uniformity, of recent vintage being the slit skirt and a few years earlier the mini which often barely qualified as a skirt. High boots have alternated with spike heels and sandals. The dresses, or blouses and skirts which are not covered by outer jackets as in the situation of men, are multi-colored and multi-patterned. Women frequently now wear slacks, an accoutrement in previous years regarded as being the exclusive province of the male.
 
 
 31
 In sum, customary business attire for the men employees of Talman seems to me to confine these employees in a uniform to the same extent as the Talman dress code does for women, in each case in reality not so much for the purpose of requiring a uniform but for the purpose of achieving a uniformity of business-like attire. One only has to observe people on the way to business jobs on the sidewalks of Chicago to be aware of the essential uniformity of male garb and the lack of that uniformity among women.
 
 
 32
 I recognize that the favorite putting-down remark that is resorted to when anyone is so bold as to delineate actual factual differences between men and women in this case, the clothing that they customarily wear is to accuse the person of indulging in stereotyping. If what I have written about the difference of clothing styles between the sexes be stereotyping, I will borrow an oft-quoted phrase from one of our forebears who, I believe, would be aghast at the extent of omnipresent governmental intrusion in our daily affairs, and simply say, "Make the most of it."
 
 
 33
 The plaintiff argues that the defendant's career ensemble requirement for female employees without an identical requirement for male employees violates § 703(a) of the Act which provides that is shall be an unlawful employment practice for an employer:(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 
 
 34
 (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
 
 
 35
 42 U.S.C. § 2000e-2(a).
 
 
 36
 I agree with the district court that this is a case of first impression. The question here, it seems to me, is whether an employer violates Title VII by enforcing a dress code which is applicable to both men and women but which is only on the surface restrictive as to women. After a thorough analysis of the case law relevant to this issue, the district court concluded that the defendant's dress code did not prevent employment opportunities and thus did not violate Title VII.
 
 
 37
 The majority opinion makes much of the fact that the district court focused on "employment opportunities" and not on "conditions of employment." It is true that the Congress put these two aspects into two separate statutory subparagraphs but I regard this out-of-any-abundance-of-caution separation as creating a distinction without a real difference. If what Talman required of its women employees did not limit them in a way which tended to deprive them of employment opportunities or otherwise adversely affect their status as an employee, I cannot conceive that there was discrimination as to conditions of their employment. The difference, if it exists, is purely semantical.
 
 
 38
 There really being no fundamental difference in impact, insofar as the present factual context is concerned, I regard it as unimportant that some judicial opinions have addressed the broader and all-encompassing "employment opportunities" and its accompanying prohibition against an adverse effect on status as an employee. The cases do make it clear that "regulations promulgated by employers which require male employees to conform to different grooming and dress standards than female employees is not sex discrimination within the meaning of Title VII." Fountain v. Safeway Stores, Inc., 555 F.2d 753, 755 (9th Cir. 1977). Accord Barker v. Taft Broadcasting Co., 549 F.2d 400, 401 (6th Cir. 1977); Earwood v. Continental Southeastern Lines, Inc., 539 F.2d 1349, 1351 (4th Cir. 1976); Longo v. Carlisle DeCoppet & Co., 537 F.2d 685 (2d Cir. 1976); Knott v. Missouri Pac. Ry. Co., 527 F.2d 1249, 1252 (8th Cir. 1975); Willingham v. Macon Telegraph Publishing Co., 507 F.2d 1084, 1092 (5th Cir. 1975) (En banc ); Dodge v. Giant Food, Inc., 160 U.S.App.D.C. 9, 13, 488 F.2d 1333, 1337 (1973).
 
 
 39
 In many of the cases the courts have not distinguished between § 703(a)(1) and § 703(a)(2). The plaintiffs have claimed a violation of § 703(a) and the courts have merely discussed whether the conduct constitutes sex discrimination within the meaning of § 703(a). Thus in Fountain, the litigation involved a discharge of the plaintiff for failure to wear a tie during working hours. Female employees did not have to wear ties. The employer had in the past amended its dress code to some extent in response to complaints from employees, but it refused to eliminate its necktie requirement. The court, without reference to a specific subsection of § 703, held that this dress code did not constitute sex discrimination under Title VII. In response to an allegation that the company responded to male and female complaints in a discriminatory manner (apparently accommodating females more readily than males), the court stated that the company's reactions to different protests merely indicated an effort to maintain dress and grooming regulations that are not overly burdensome to its employees yet still serve to extend an image to its customers which it believed was beneficial to its business. "This power to amend regulations for one sex independent of any action with respect to the regulations for the other sex flows directly from the employer's power to promulgate separate regulations in the first place." Id. at 756.
 
 
 40
 In Barker v. Taft Broadcasting Co., 549 F.2d 400 (6th Cir. 1977), the plaintiff was discharged because of his hair length pursuant to a grooming code which mandated shorter hair length for men than for women. Indeed, the women's code apparently did not restrict length at all, but limited only the manner in which their hair could be styled. The court concluded that the complaint, which apparently did not specify a subsection of § 703, did not state a claim. Although the majority opinion does not mention a specific subsection of § 703, the dissent by Judge McCree says that the majority opinion was based on § 703(a)(1). The dissent, however, does not then articulate any difference between the two subsections. The majority's reasoning was that: "Employer grooming codes requiring different hair lengths for men and women bear such a negligible relation to the purposes of Title VII that we cannot conclude they were a target of the Act." Id. at 401.
 
 
 41
 In Knott v. Missouri Pacific Railroad Co., 527 F.2d 1249 (8th Cir. 1975), the plaintiffs were discharged for not complying with the employer's hair length regulation which applied only to male employees. The employer had no similar regulation restricting the hair length or hair style of female employees. The court quoted both subsections of § 703(a) but did not discuss them separately. In reviewing the little legislative history that exists, it stated that "the legislative history accompanying passage of the 1972 amendments makes clear, however, that the primary thrust of the provision was to discard outmoded sex stereotypes posing distinct employment disadvantages for one sex." Id. at 1251. The court summarized the case law as concluding that the Act "was never intended to interfere in the promulgation and enforcement of personal appearance regulations by private employers." Id. at 1251-52. In reaching its holding that "minor differences in personal appearance regulations that reflect customary modes of grooming do not constitute sex discrimination within the meaning of (§ 703(a))," it stated that "(w)here, as here, such policies are reasonable and are imposed in an evenhanded manner on all employees, slight differences in the appearance requirements for males and females have only a negligible effect on employment opportunities." Id.
 
 
 42
 Other courts, however, without particular recognition that they were focusing on either subsection did refer to the "employment opportunity" theory. In Dodge, for example, different hair-length requirements for male and female employees were held valid under Title VII on the theory that Title VII was not "intended to invalidate grooming regulations which have no significant effect upon the employment opportunities afforded one sex in favor of the other." 160 U.S.App.D.C. at 13, 488 F.2d at 1337.
 
 
 43
 Similarly, in Willingham the Fifth Circuit, sitting En banc, upheld an employer's sex-differentiated hair length regulation and adopted the view that sex discrimination on the basis of something other than immutable characteristics or the exercise of constitutionally or statutorily protected rights does not inhibit employment opportunity in violation of Title VII. 507 F.2d at 1191-92. The Fourth Circuit followed this reasoning in Earwood to uphold a similar hair-length regulation. The majority in Earwood specifically distinguished between discrimination based on factors of personal preference (e. g. hair length or mode of dress) and discrimination based on either immutable sex characteristics or constitutionally protected activities such as marriage or child rearing. 539 F.2d at 1351.[2]
 
 
 44
 Even if we extended the scope of Title VII beyond the exercise of fundamental rights or one's possession of certain immutable characteristics as urged in the dissent in Earwood, I think we should go no farther than to adopt an equitable analysis, and one which appears to me to reflect Congressional intent more accurately, and makes cognizable under § 703(a) discrimination based on any factor which substantially burdens employment opportunities or Enjoyment for the employees of one sex. This approach follows from and is consistent with this court's broad view of Title VII expressed in Sprogis v. United Air Lines, 444 F.2d 1194, 1198 (7th Cir. 1971), that "Section 703(a)(1) subjects to scrutiny and eliminates such irrational impediments to job opportunities and Enjoyment which have plagued women in the past." (Emphasis added.)
 
 
 45
 It appears to me in the interest of accomplishing the Congressional objective rather than engaging in semantical hairsplitting as to the differences between employment opportunities and employment conditions that any issues presented under § 703(a) could be better analyzed from the point of view of whether the claimed discrimination inhibits one sex more than the other in the enjoyment of their jobs. In the present case this would require a determination of whether the on-the-surface sex-differentiated dress standards substantially burden female employees' enjoyment of their jobs more than that of male employees. In essence it appears clear to me in this case that both groups are required to conform to a status of wearing customary business attire.[3]
 
 
 46
 Looking once more at what Talman's female dress code specifically involves, it is clear that it is not strait-jacketing but does offer substantial variety, all of which nevertheless is designed to create a businesslike rather than a fashion fair atmosphere. The variety permits slacks or one of three different skirts to be combined with either a jacket, tunic, or vest. With this tow-piece outfit the woman may wear a variety of other clothing substantially of her own choosing, including blouses, sweaters, scarves, hosiery, and shoes. She also may wear any combination of her choosing each day. The variety of apparel available to female employees within the career ensemble regulations militates against finding a substantial burden on enjoyment of their jobs vis-a-vis male employees. Accordingly, a decision affirming the district court would not render all sex-differentiated dress codes impervious to Title VII scrutiny. We do not here have a case presenting a policy which requires females to wear only a specific uniform with less individual discretion to choose accompanying items of clothing, and which gives males broad discretion in choosing their work attire. When such a case is presented it will then be appropriate to determine whether the policy would burden females in the enjoyment of their jobs sufficiently to violate Title VII.
 
 
 47
 A second factor in the present case is that the career ensembles women are required to wear are not unattractive in style, inferior in quality, ill-fitting, or uncomfortable such that they would cause embarrassment or be considered demeaning.[4] A female employee wearing a career ensemble would not appear less well-dressed than a male employee dressed according to the regulations applicable to him. As I stated at the outset of this dissent the dress standards applied to both men and women result in ordinary business attire although the rules are semantically different. This difference in form, although not in substance, is not sufficient to constitute a substantial burden for females in the enjoyment of their jobs. Again, we would have a quite different case if, for example, the female employees of a savings and loan association were required to wear dehumanizing or uncomfortable clothing, or drab unstylish outfits, or any other attire which by the acceptable female dress norms of the time would be considered as embarrassing or demeaning to the wearer while male employees were only required to wear conventional business suits. Indeed, it is again to be noted that the Talman policy does not require distinctively female attire such as skirts only, slacks being permitted.
 
 
 48
 A further factor contributing to my conclusion that the dress code in this case did not substantially burden female employees more than male employees in the enjoyment of their jobs is that there has been no particular oblatration, if indeed any complaint at all, by female employees about the dress code, and in fact, the response has for years been positively favorable. The lack of complaint and generally positive response by female employees to the career ensemble program may well be due to the process by which the career ensemble is selected. A Career Ensemble Committee consists of six women employees chosen to provide a cross-section as to age, clothing size, job functions, and level in the corporate hierarchy. This committee selects the style, color, and supplier of the career ensemble. All female employees can make comments and suggestions to the committee which reviews them and recommends changes.
 
 
 49
 Finally, I regard the emphasis in the majority opinion on the fact that the women have to pay income tax on the first outfit provided to them without cost as nit-picking. When the men buy their business wear apparel they pay the full price without any tax deduction, the amount being far more substantial than the income tax based on the cost of the clothing received by the women. Women, of course, have to keep their ensembles in repair and cleaned. So do the men. Any replacements must be paid for by the women. Likewise the men must pay for the clothing they wear.
 
 
 50
 Opponents of the Equal Rights amendment have argued that its adoption would be followed by extreme applications bordering on the ridiculous where no meaningful discrimination exists. The result reached by the majority opinion in the application of the statute I can only regard as adding strength to that argument.
 
 
 
 [1]
 These 675 employees are tellers, officers and managerial personnel
 
 
 [2]
 Section 703(a)(1) provides:
 "(a) It shall be an unlawful employment practice for an employer
 "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin * * *." (42 U.S.C. § 2000e-2(a)(1).)
 
 
 [3]
 The photograph is Exhibit I to defendant's Memorandum on Summary Judgment and is reproduced on page 1 of defendant's Supplemental Appendix
 
 
 [4]
 In Los Angeles Dept. of Water & Power v. Manhart, 435 U.S. 702, 708, 98 S.Ct. 1370, 55 L.Ed.2d 657, a similar height limitation was condemned under Section 703(a)(1)
 
 
 [5]
 As we point out Infra, the employer had numerous alternative means of assuring that all its employees wear business-like apparel that would not contravene Title VII
 
 
 [6]
 We do not think the personal taste of this Court is relevant to the rights involved in this appeal, but we are quite certain that there is room for differences of opinion on the sartorial excellence of the uniforms
 
 
 [7]
 This passage was quoted with approval in Los Angeles Dept. of Water & Power v. Manhart, 435 U.S. 702, 707, n. 13, 98 S.Ct. 1370, 55 L.Ed.2d 657
 
 
 [8]
 Other cases showing that even though many of the women employees like the uniforms, that is no defense to a violation of Section 703(a)(1) include Diaz v. Pan Am World Airways, Inc., 442 F.2d 385, 389 (5th Cir. 1971); Sprogis v. United Air Lines, Inc., 444 F.2d 1194, 1199 (7th Cir. 1970), certiorari denied, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543; Doe v. Osteopathic Hospital of Wichita Inc., 333 F.Supp. 1357, 1362 (D.Kan.1971). The reference to "enjoyment" in Sprogis relied upon in the dissent was to job enjoyment rather than any satisfaction that defendant's employees might derive from their clothing. See 444 F.2d 1194, 1198
 
 
 [9]
 See, E. g., United States v. St. Louis-San Francisco Railway Co., 464 F.2d 301, 308 (8th Cir. 1972), certiorari denied, 409 U.S. 1107, 93 S.Ct. 900, 34 L.Ed.2d 687; Sagers v. Yellow Freight System, Inc., 529 F.2d 721 (5th Cir. 1971); United States v. Bethlehem Steel Corp., 446 F.2d 652, 662 (2d Cir. 1971)
 
 
 [10]
 It would not be offensive, for example, if the employer required its female employees to wear business-like skirts or pants and a vest or jacket
 
 
 [11]
 If the dissent is correct that the response to the uniforms has been "positively favorable," one would expect little effect on the employer's dress code in making the uniforms optional
 
 
 [12]
 Section 703(a)(2) provides:
 "(a) It shall be unlawful employment practice for an employer
 "(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." (42 U.S.C. § 2000e-2(a)(2).)
 
 
 [13]
 Defendant insists that sex discrimination must involve a deprivation of opportunity for employment or of the benefits of employment in order to violate Section 703(a)(1) (Supra note 2). However, that Section proscribes discrimination with respect to terms and conditions of employment, as well as compensation and privileges. Other courts have recognized that personal appearance regulations that treat male and female employees differently are proscribed by Section 703(a)(1) at least where, as here, they cannot be justified as reasonably related to the employer's business needs. Roberts v. General Mills, Inc., 337 F.Supp. 1055 (N.D.Ohio 1971); Donohue v. Shoe Corporation of America, 337 F.Supp. 1357 (C.D.Cal.1972); Aros v. McDonnell Douglas Corporation, 348 F.Supp. 661 (C.D.Cal.1972); Rafford v. Randle Eastern Ambulance Service, Inc., 348 F.Supp. 316 (S.D.Fla.1972)
 
 
 [14]
 In Fagan, the hair-length rule applied only to service representatives, whose jobs took them to the premises of customers during business hours. Although the plaintiff argued primarily that the regulation unconstitutionally invaded his privacy interests, he also suggested that the regulation constituted sex discrimination. However, apart from the fact that the regulation reflected social norms and was reasonable, there were no women service representatives in comparison to whom the plaintiff could even arguably have been treated disadvantageously
 
 
 [15]
 The other two cases on which the district court relied, Jarrell v. Eastern Air Lines, 430 F.Supp. 884 (E.D.Va.1977), and In re National Airlines, Inc., 434 F.Supp. 269 (S.D.Fla.1977), upheld weight limitations imposed on flight attendants as part of the employer's personal appearance regulations. In both cases, however, the courts undertook a careful analysis of the weight limitation rules and how they were applied to both male and female employees. Each court concluded that the rules at issue, unlike those in Laffey v. Northwest Airlines, Inc., supra, did not discriminate on the basis of sex. The two cases are thus consistent both with Laffey and with our conclusion in this case, since a factual determination of whether the rule was discriminatory in application would have been unnecessary if employees' rights under Title VII were as limited as defendant contends
 
 
 [16]
 The defendant refers to the clothing at issue here as a "career ensemble" rather than a uniform, but that euphemism does not alter our analysis. Days on which female employees are exempted from the requirement of wearing the uniform are referred to by the defendant as "glamour days."
 
 
 [17]
 Contrary to the implication in the dissent, our previous discussion of other cases involving appearance regulations clearly shows that we do not view the recognition of different dress norms for males and females to be offensive or illegal stereotyping. What is offensive is the compulsion to wear employer-identified uniforms and the assumption on which the employer openly admits that rule is based: that women cannot be expected to exercise good judgment in choosing business apparel, whereas men can
 
 
 [1]
 Men are so unfortunately locked in to these narrow style changes that now they frequently are unable to purchase a tropical weight suit without a restrictive vest which is a ludicrous third piece in a summer which marks perhaps the end of a synonymity between air conditioning and coolness
 
 
 [2]
 The cases to which I have referred all involve discrimination complaints by male employees. I do not conceive that either the plaintiff or the majority opinion takes the position that there should be a difference of standard dependent upon the sex of the complainant
 
 
 [3]
 The dress code in the present case does not restrict employment possibilities for women. No jobs or promotions are barred to women because of it. Moreover, the plaintiff does not claim that the dress code is a mere pretext intended to limit employment for women
 
 
 [4]
 See the discussion hereinafter on how the employees themselves select the style of the ensembles