**Deborah MARKS, Plaintiff,**

v.

**NATIONAL COMMUNICATIONS ASSOCIATION, INC., Defendant.**

**No. 95 Civ. 9727(PKL).**

United States District Court, S.D. New York.

Oct. 26, 1999.

Law Offices of Samuel A. Abady and Associates, P.C., New York City, Samuel A. Abady, John Burleigh, of counsel, for plaintiff.

Mussman & Northey, New York City, Rebecca Northey, of counsel, for defendant.

### OPINION AND ORDER

LEISURE, District Judge.

Plaintiff Deborah Marks brings this action claiming illegal gender discrimination and retaliation. Specifically, plaintiff alleges that she was denied a promotion because her employer applied weight standards to women but not to men, and that she was later fired for complaining about discrimination. Plaintiff's Amended Complaint asserts claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.* ("Title VII"), New York Exec. Law § 296,[1] New York Civil Rights Law § 40–c,[2] and New York City Admin. Code §§ 8–107 and 8–502 *et seq.*[3]

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendant now moves for summary judgment. For the reasons discussed below, defendant's motion is granted.

### BACKGROUND

Defendant National Communications Association ("NCA") is a telephone services reseller.[4] During 1993 and 1994, NCA was engaged in selling telephone systems and NYNEX services and reselling long distance telephone services. *See* Defendant's Statement Pursuant to Loc. Civ. R. 56.1 ("Def. 56.1 Stmt.") at ¶ 1. NCA employed a number of telemarketers, who were responsible for contacting potential custom-

1. N.Y. Exec. Law § 296.1 provides:

It shall be an unlawful discriminatory practice:
 (a) For an employer or licensing agency, because of the ... gender ... of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment....
 (e) For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this article or because he has filed a complaint, testified or assisted in any proceeding under this article.

2. N.Y. Civil Rights Law § 40–c(2) provides: "No person shall, because of race, creed, color, national origin, sex, marital status or disability, as such term is defined in [N.Y. Exec. Law § 222] be subjected to any discrimination in his civil rights, or to any harassment, as defined in [N.Y. Penal Law § 240.25], in the exercise thereof, by any other person or by any firm; corporation or institution, or by the state or any agency or subdivision of the state."

3. The language of New York City Admin. Code § 8–107.1(a) closely tracks N.Y. Exec. Law § 296 and N.Y. Civil Rights Law § 40–c. *See Pell v. Trustees of Columbia Univ.,* No. 97 Civ. 0193, 1998 WL 19989, at \*21 n. 14 (S.D.N.Y. Jan. 21, 1998). Section 8–502 provides that "any person claiming to be aggrieved by an unlawful discriminatory practice ... shall have a action ... for damages, including punitive damages, and for injunctive relief."

4. "In the industry, NCA is called a reseller—one who engages in the business of purchasing long-distance telecommunication services at large-volume rates from a supplier, such as AT & T, and resells those services to others whose volume of use individually would not qualify them to purchase directly from the supplier." *National Communications Ass'n Inc. v. AT & T,* 46 F.3d 220, 221 (2d Cir. 1995).

ers to generate interest in its products and to schedule face-to-face appointments with sales representatives. *See id.* In May 1993, NCA hired Plaintiff Deborah Marks ("Marks") as a telemarketer. *See id.* at ¶ 2; Am. Compl. at ¶ 8. During the tenure of her employment with NCA, Marks received consistently outstanding performance reviews and evaluations and was awarded prizes and other commendations for her performance as a telemarketer. *See* Plaintiff's Statement Pursuant to Loc. Civ. R. 56.1 ("Pl. 56.1 Stmt.") at ¶ 2; Am. Compl. at ¶ 14. In fact, Marks was designated "Telemarketer of the Month" in August, September, November, and December of 1993, and was ultimately named "Telemarketer of the Year" for 1993. *See* Pl. 56.1 Stmt. at ¶ 2; Am. Compl. at ¶ 15.

Marks's immediate supervisor at NCA was her manager, John Fortgash ("Fortgash"). *See* Pl. 56.1 Stmt. at ¶ 4; Am. Compl. at ¶ 10; Marks Dep. at 29–30. Marks's work performance was also overseen by Scott Chase ("Chase"), NCA Senior Manager, and Richard McGuire ("McGuire"), NCA Vice President for Telemarketing. *See* Pl. 56.1 Stmt. at ¶ 5; Am. Compl. at ¶ 5; Marks Dep. at 30. Her supervisors generally agreed that she was a productive telemarketer, but found her difficult to work with. *See* Def. 56.1 Stmt. at ¶ 11; McGuire Decl. at ¶ 5. Marks had frequent disputes with Chase, which McGuire had to mediate. *See* Def. 56.1 Stmt. at ¶ 13; McGuire Decl. at ¶ 12. Specifically, Marks often complained about NCA's procedures for distributing "leads" among the telemarketers (the "lead procedures") and accused co-workers of stealing her "leads." *See* Def. 56.1 Stmt. at ¶ 14–16; McGuire Decl. at ¶ 3; *see also* Marks Dep. at 71.

On numerous occasions, Marks requested that she be appointed to the position of sales representative. *See* Pl. 56.1 Stmt. at ¶ 6; Am. Compl. at ¶ 11; Marks Dep. at 30; *see also* Def. 56.1 Stmt. at ¶ 19. On February 4, 1994, Marks learned from Selena Thomas ("Thomas") that NCA had

denied Marks's request for promotion and had instead appointed Thomas to the position. *See* Pl. 56.1 Stmt. at ¶ 7; Marks Dep. at 159. Marks claims that Thomas told her that McGuire had remarked to Thomas that Marks would have received the promotion as well, if Marks had lost weight. *See* Pl. 56.1 Stmt. at ¶ 7; Marks Dep. at 159. During her tenure as a telemarketer for NCA, Marks weighed approximately 270 pounds. *See* Pl. 56.1.Stmt. at ¶ 3; Marks Dep. at 17.

Thereafter, Marks complained to McGuire and Chase that the decision had been unjust and unfair, because she had been the best telemarketer in the company, and had just been named "Telemarketer of the Year." *See* Pl. 56.1 Stmt. at ¶ 8; Marks Dep. at 159. According to Marks, McGuire replied: "Deb, I've told you, outside sales, presentation is extremely important. Lose the weight and you will get promoted." Marks Dep. at 161. Chase allegedly told her "[t]o lose the weight and that was important for outside sales because you were—you weren't just on the telephone, you were going around from person to person and therefore presentation was extremely important." *Id.*

Following these conversations, between February 4 and February 9, 1994, Marks had numerous discussions with other employees about the alleged discrimination against her. *See* Pl. 56.1 Stmt. at ¶ 12; Marks Dep. at 82, 84, 165–68. During that period, according to Marks, there was "general talk" in the telemarketing department that Thomas had been promoted instead of Marks because Thomas was "thin and cute." Pl. 56.1 Stmt. at ¶ 13; Marks Dep. at 70. Marks contends that the terms "thin" and "cute" "apply specifically to women and their use reflects a stereotyped focus on physical appearance wh[ere] female employees in positions of importance are concerned." Pl. 56.1 Stmt. at ¶ 14.

On February 9, 1994, Chase and Fortgash informed Marks that she was being suspended without pay for one week. *See*

*id.* at ¶ 16–17. Marks attests that Chase and Fortgash "were upset by Marks's complaints about being discriminated against and being passed over for sales representative in favor of a vastly less qualified woman who happened to be thinner and cuter." *Id.* at ¶ 17. NCA maintains, however, that after Chase overheard Marks complaining again about the lead procedures with co-workers, Chase told her, "in accordance with company policy," to "go home for the day and not to come back until she spoke to McGuire." Def. 56.1 Stmt. at ¶ 50; *see also* Marks Dep. at 82–83. Marks claims that NCA insisted that she sign a document indicating that she accepted her suspension. *See* Pl. 56.1 Stmt. at ¶ 18; Marks Dep. at 126, 173–74; *see also* Def. Stmt. at Ex. E. She refused to sign the document because she disagreed with its content and refused to be "complicit" in "something that [she] didn't believe [she] deserved a suspension for." Pl. 56.1 Stmt. at ¶ 19; *see also* Marks Dep. at 108.

Later that afternoon, Marks spoke by telephone with two co-workers, Chase Warren ("Warren") and John Reynolds ("Reynolds"), about the incident. *See* Def. 56.1 Stmt at ¶ 33. In both conversations, which she taped, she stated that she was not planning to go back to work because she refused to continue working for Chase. *See* Def. 56.1 Stmt. at ¶ 33–34; Warren Tape Tr. at 3; Reynolds Tape Tr. at 1–2. She told Reynolds that she had already scheduled five job interviews and had consulted a lawyer that afternoon. *See* Reynolds Tape Tr. at 6–8.

The next day, Marks telephoned Chase, and also taped that conversation. *See* Def. 56.1 Stmt. at ¶ 38–41; Chase Tape Tr. at 1–20. During their discussion, Chase announced to Marks that she was being suspended for one week; Marks responded that she would rather be fired so that she could collect unemployment benefits. *See*

Def. 56.1 Stmt. at ¶ 39; Chase Tape Tr. at 1, 17–19; Marks Dep. at 107–10. In her Statement pursuant to Local Rule Civil 56.1, Marks states that "immediate termination was preferable to suspension without pay ... because the latter meant no money at all during the period of suspension and further jeopardized future prospects for such benefits or for other employment insofar as [I] was being asked to agree with the pretextual grounds given for [my] suspension." Pl. 56.1 Stmt. at ¶ 20; *see also* Marks Dep. at 107–10, 189. Although Chase tried to persuade Marks to accept the suspension and return to work the following week, Marks persisted in her demand to be fired. *See* Def. 56.1 Stmt. at ¶ 40; Chase Tape Tr. at 17–20. After consulting with McGuire, and after warning Marks to "learn when to stop talking ... because you're getting real close to making the final decision here that I don't want to make unnecessarily," Chase notified her that she was fired. *See* Pl. 56.1 Stmt. at ¶ 22; Def. 56.1 Stmt. at ¶ 41; Chase Tape Tr. at 19; McGuire Decl. at ¶ 8.

Marks subsequently filed a timely complaint with the Equal Employment Opportunity Commission ("EEOC"), which on August 28, 1995, dismissed her complaint, stating that it had been "unable to conclude that the information obtained establishes violations of the statutes." Def. 56.1 Stmt., Northey Decl., Ex. A. The EEOC issued Marks a right-to-sue letter, and on November 11, 1995, she filed the instant action. Marks claims that NCA refused to promote her because it applied more stringent weight and attractiveness standards to women than to men. She maintains that NCA's employment decisions were based upon "improper and discriminatory stereotypes of what it deemed to be the 'acceptable' appearance of a female in a position of importance at NCA." Am. Compl. at ¶ 26.[5] Marks also alleges that

---

**5.** On June 30, 1997, this Court granted in part and denied in part Marks's motion to amend her complaint. The Court granted Marks's

request to amend her complaint to include additional statutory claims, but denied her request to plead claims against Fortgash,

her suspension and termination were motivated by a desire to punish her "for complaining to other employees about her discrimination." Pl. 56.1 Stmt. at ¶ 23.[6]

## DISCUSSION

### I. Standard for Summary Judgment

A moving party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 128 (2d Cir.1996). The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gallo v. Prudential Residential Servs. L.P.*, 22 F.3d 1219, 1223–24 (2d Cir.1994). "In

moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995).

In deciding a motion for summary judgment, the Court's function is not to try issues of fact,[7] but instead to determine whether there remain any such issues to try. *See Sutera v. Schering Corp.*, 73 F.3d 13, 15–16 (2d Cir.1995). In doing so, the Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Holt*, 95 F.3d at 129. However, the substantive law governing the case will identify those facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will preclude the entry of summary

Chase, and McGuire as individuals, on the ground that such claims would be time-barred and would not be deemed to relate back to the claims in the original complaint. *See Marks v. National Communications Ass'n*, No. 95 Civ. 9727, 1997 WL 361996, at *2 (S.D.N.Y. June 30, 1997).

**6.** Marks has abandoned her disability discrimination claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, as well as her disability claims under state law. *See* Pl. Mem. at 1 n. 1; Def. Mem. at 3; Def. 56.1 Stmt. at ¶ 9; *see also* Jan. 28, 1998 Conference Tr. at 5–9 (transcribing representations by plaintiff's counsel that he would not pursue these claims). As such, Marks's third, fourth, seventh, eighth, eleventh, and twelfth causes of action shall be dismissed with prejudice. *See New York State Ass'n of Career Schools, Inc. v. State Educ. Dep't*, 142 F.R.D. 403, 406 (S.D.N.Y.1992) (dismissing with prejudice claims deemed abandoned); *Withers v. Teachers' Retirement System*, 447 F.Supp. 1248, 1261 (S.D.N.Y.1978) ("Plaintiffs have apparently abandoned this claim, and it is now dismissed with prejudice").

**7.** The Court is mindful of Judge Weinstein's observation in *Gallagher v. Delaney*, 139 F.3d

338, 342 (2d Cir.1998), that "a jury made up of a cross-section of our heterogenous communities provides the appropriate institution for deciding whether borderline situations should be characterized as sexual harassment and retaliation." Accordingly, Judge Weinstein concluded that certain factual issues cannot be effectively settled by a decision of an Article III judge on summary judgment. *See id.* Unlike the typical sexual harassment claim, however, in which statements fraught with subtlety and innuendo dominate the record, the instant case does not require the Court to "interpret[ ] subtle sexual nuances, perceptions, and implicit communications," *id.* Nor does this action involve difficult issues of state of mind or intent. *See, e.g., Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988). Rather, this case requires only the interpretation of legal issues, which this Court is well-equipped to consider and decide. As this is not a "borderline" case, and because "the salutary purposes of summary judgment—avoiding protracted, expensive, and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation," *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985), it is appropriate for this Court to consider summary judgment at this stage.

judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Dister*, 859 F.2d at 1112 (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Mere speculation or conjecture" will not suffice, *see Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990), nor will "reliance on unsupported assertions," *Goenaga*, 51 F.3d at 18. Rather, the nonmoving party must provide "concrete evidence from which a reasonable juror could return a verdict in [her] favor." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

## II. Plaintiff's "Gender Plus" Claims

Marks has based her discrimination claims on a theory of "gender plus" discrimination. In short, she contends that NCA refused to promote her to the position of sales representative on the basic of a characteristic it would not have considered were she of the opposite gender: physical appearance (specifically, her weight).

Under Title VII, it is unlawful "for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The statute has been read to encompass discriminatory failures to promote. *See, e.g., Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709–10 (2d Cir. 1998).

The Supreme Court first recognized "gender plus" discrimination in *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) (per curiam). The *Phillips* Court held that Title VII does not "permit[ ] one hiring policy for women and another for men." *Phillips*, 400 U.S. at 544, 91 S.Ct. 496. Unless the condition in question is a "bona fide occupational qualification" under 42 U.S.C. § 2000e–2(e), *see Phillips*, 400 U.S. at 544, 91 S.Ct. 496, an employer may not "treat men characterized by [the] additional characteristic more or less favorably than women with the same added characteristic." *Martinez v. N.B.C., Inc.*, 49 F.Supp.2d 305, 310 (S.D.N.Y.1999). In particular, an employer may not apply different appearance standards to men and women based on gender stereotypes. *See Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 862–863 (3d Cir.1990) (Becker, J.) ("Undue preoccupation with what female employees look like is not permissible under anti-discrimination laws if the same kind of attention is not paid to male employees."); *see also EEOC v. Sage Realty Corp.*, 507 F.Supp. 599 (S.D.N.Y.1981) (ruling that a requirement that female employees wear revealing clothing constituted gender discrimination).

As in *Phillips*, in which 75 to 80 percent of those hired for the position at issue were women, *see Phillips*, 400 U.S. at 544, 91 S.Ct. 496, there is no serious question of any general bias at NCA against hiring women, *see Fisher v. Vassar College*, 70 F.3d 1420, 1433 (2d Cir.1995) (*"Fisher I"*), *reh'g*, 114 F.3d 1332 (2d Cir. 1997) (en banc) (*"Fisher II"*), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998), *reh'g denied*, 523 U.S. 1041, 118 S.Ct. 1341, 140 L.Ed.2d 501 (1998). In fact, it is undisputed that NCA ultimately selected a woman, Selena Thomas, for the promotion. In a "gender plus" case, however, the fact that the NCA hired someone of the same gender as the plaintiff does not itself defeat an otherwise legitimate inference of discrimination. *See Trezza v. The Hartford, Inc.*, No. 98 Civ. 2205, 1998 WL 912101, at *6 (S.D.N.Y. Dec.30, 1998). The Second Circuit has recognized that discrimination against an individual based

on gender "plus" another characteristic, such as marital status, see *Fisher I*, 70 F.3d at 1432–38, may serve as the basis for a Title VII action. Moreover, although the Second Circuit has not directly addressed the issue, cosmetic weight regulations have been held to violate the statute. *See, e.g., Gerdom v. Continental Airlines, Inc.*, 692 F.2d 602 (9th Cir.1982) (en banc); *Laffey v. Northwest Airlines, Inc.*, 374 F.Supp. 1382 (D.D.C.1974), *aff'd in part, vacated in part on other grounds*, 567 F.2d 429 (D.C.Cir.1976).

There is nothing to suggest that discrimination based on weight, when practiced against one sex but not the other, should not constitute a violation of Title VII. Although an employer may, when selecting its employees, take into consideration weight or other physical characteristics, *see, e.g., Francis v. City of Meriden*, 129 F.3d 281 (2d Cir.1997), it may not impose weight requirements on women but not men, or vice versa. Therefore, if Marks can prove that NCA maintained different weight standards for women than it used for men,[8] whether explicit or not, she will have satisfied her burden of proving "gender plus" discrimination. Still, discrimination based on weight *alone,* or on any other physical characteristic for that matter, does *not* violate Title VII, unless issues of race, religion, sex, or national origin are intertwined.

Title VII claims of discrimination, and particularly allegations of failure to promote must be analyzed under the three-part burden shifting test of *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). As summarized by the Second Circuit:

> Initially, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, assuming the plaintiff demonstrates a prima facie case, the burden of production shifts to the employer to articulate a legitimate, clear, specific and non-discriminatory reason for refusing to promote the employee. Third, if the defendant satisfies this burden of production, the plaintiff has the ultimate burden to prove that the employer's reason was merely a pretext for discrimination.

*Holt*, 95 F.3d at 129 (citations omitted).

A plaintiff may establish a *prima facie* case of gender discrimination by showing

> (1) that the plaintiff is a member of a protected class, (2) that the plaintiff applied for and was qualified for a job for which the employer was seeking applicants, (3) that despite these qualifications, the employer rejected the plaintiff and (4) that, after this rejection, the job remained open and the employer continued to seek applicants having the plaintiff's qualifications.[9]

*Fisher I*, 70 F.3d at 1433. Meeting this burden is "not onerous," *Richardson v. New York State Dep't of Correctional Service*, 180 F.3d 426, 444 n. 4 (2d Cir.1999), and has often been characterized as *de minimis, see Fisher II*, 114 F.3d at 1340 n.

---

**8.** Obviously, this does not mean that male and female employees must be subjected to the exact same weight requirements. It would be absurd to require women and men to meet the same weight standards, since men, on average, weigh more than women of the same height. *See Jarrell v. Eastern Air Lines, Inc.*, 430 F.Supp. 884, 890 (E.D.Va.1977), *aff'd,* 577 F.2d 869 (4th Cir.1978). So long as higher maximum weights for male employees are based on medically recognized distinctions between the sexes and are applied even-handedly to men and women, there is no significant burden of compliance imposed on either sex, and thus no Title VII violation.

*See Maximum Weight Requirements*, 45A Am. Jur.2d Job Discrim. § 462 (1993); *see also Jarrell*, 430 F.Supp. at 892–93.

**9.** Put more succinctly by the Second Circuit *en banc*, plaintiff must show "membership in a protected class, qualification for the position, an adverse employment action, and the ultimate filling of the position by a person not of the protected class." *Fisher II*, 114 F.3d at 1335 (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

7 (collecting cases). Marks has satisfied this threshold test by averring that (1) she was an overweight women, (2) who had received commendation for her work and was therefore qualified for a promotion,[10] (3) yet was not promoted, and (4) instead, a "thin and pretty" female was hired for the position. She alleges that NCA applied disparate weight standards for male and female applicants for the position of sales representative, evidenced in part by its selection of Thomas over her. *See* Am. Compl. at ¶¶ 26–29.[11]

With regard to the second step under the *McDonnell Douglas* burden-shifting approach, NCA has sustained its burden of offering "some legitimate, nondiscriminatory reason" for its decision. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. NCA need only allege—not prove—the that such a justification exists. *See Fisher I*, 70 F.3d at 1433. For the purposes of this motion, NCA's submissions "assume that Thomas was thinner than Marks and was less productive as a telemarketer."

Def. Mem. at 4; *see also* Def. 56.1 Stmt. at ¶ 20. Moreover, not only is such an assumption consistent with NCA's substantive argument in its motion, it is also consistent with statements allegedly made to Marks by NCA's representatives. For example, McGuire stressed that "outside sales, presentation is extremely important" and told Marks: "Lose the weight and you will get promoted." Marks Dep. at 161. Similarly, she was told by Chase "[t]o lose the weight and that was important for outside sales because you were—you weren't just on the telephone, you were going around from person to person and therefore presentation was extremely important." *Id.* Finally, the assumption finds support in the declaration from NCA's president, stating that he could recall no overweight men holding the position of sales representative at NCA. *See* Schoenberg Decl. at ¶ 5. For the purposes of this motion, therefore, NCA apparently concedes that its decision was made based on Marks's weight—yet firmly denies that it had anything whatsoever to do with her

---

**10.** Defendant's motion papers ask the Court to assume, for the purposes of this motion, that Marks was more productive as a telemarketer than Thomas. *See* Def. 56.1 Stmt. at ¶ 20. The obvious implication of such an assumption is that Marks was just as "qualified" as Thomas, if not more so, for the position of sales representative.

**11.** NCA's reply brief suggests that evidentiary deficiencies in plaintiff's case, discussed *infra*, cause plaintiff to fail to satisfy her initial burden. *See* Def. Rep. Mem. at 5 n. 7. NCA cites *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), in which the Supreme Court held that "any Title VII plaintiff must carry the *initial burden* of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." (emphasis added). However, defendant would ignore the accompanying footnote, which stressed that this "initial burden" merely requires the plaintiff to "demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifica-

tions or the absence of a vacancy in the job sought. Elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one." *Id.* at 358 n. 44, 97 S.Ct. 1843. In the case at bar, plaintiff carries this burden with ease. As in *Fisher I*, plaintiff's evidentiary problems are only relevant to the third stage of the *McDonnell Douglas* burden-shifting test, in which she must demonstrate that NCA's real reason for denying her the promotion was discrimination based on either gender or gender plus physical appearance. At this initial stage, however, "[a]s a matter of pleading, [Marks has] satisfied the threshold test of *McDonnell Douglas* by alleging discrimination against women." *Fisher I,* 70 F.3d at 1434; *see also Hollander v. American Cyanamid Co.,* 172 F.3d 192, 199–200 (2d Cir.1999), (deciding whether plaintiff had "presented sufficient evidence for a reasonable jury to conclude that [defendant] discriminated against him because of his age" at this third stage of the *McDonnell Douglas* test, in part by considering whether plaintiff's statistical evidence was sufficient to prevent summary judgment), *petition for cert. filed,* —— U.S. ——, 120 S.Ct. 399, —— L.Ed.2d —— (1999).

gender.[12]

The crux of NCA's motion for summary judgment concerns Marks's ultimate burden of persuading the trier of fact that NCA intentionally discriminated against her. Notwithstanding *McDonnell Douglas*'s burden-shifting formula, this burden remains at all times with the plaintiff. *See Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. Once the defendant has offered its justification for the hiring decision, the plaintiff "must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision." *Id.* at 256, 101 S.Ct. 1089. She may accomplish this "either directly, by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*

■ Marks maintains that NCA's practice of refusing to hire overweight applicants for the position of sales representatives applied only to women. In order to establish this claim of disparate treatment, Marks must present some evidence that NCA treated overweight men differently than overweight women. *See Fisher I,* 70 F.3d at 1447 ("To establish that Vassar discriminated on the basis of sex plus marital status, plaintiff must show that married men were treated differently from

married women.");[13] *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 290 (2d Cir.1998); *Malarkey v. Texaco, Inc.,* 704 F.2d 674, 674 (2d Cir.1983); *Bass v. Chemical Banking Corp.,* No. 94 Civ. 8833, 1996 WL 374151, at *5 (S.D.N.Y. 1996). Mere allegations of discrimination will not suffice; absent proof, such a claim must fail.

Accordingly, the viability of Marks's theory of "gender plus" discrimination hinges on her ability to show that NCA refused to hire overweight women, like herself, as sales representatives, but had no such restriction on hiring overweight men. NCA, however, denies the existence of any overweight men working in the sales department. To support its denial, NCA's President, George Schoenberg, submitted a declaration stating that he "do[es] not recall any overweight men holding [the] position" of sales representative with the company. Pl. Mem. at 6; *see also* Schoenberg Decl. at ¶ 5. The affidavit of the president of the company should be afforded great weight, particularly since Schoenberg was "familiar with the people who have served in the sales representative title." *Id.*

Marks asserts that there were in fact overweight male sales representatives and that consequently a "genuine issue of material fact" exists. *See* Pl. Mem. at 6. In

12. NCA's submissions also seem to imply that Marks did not receive the promotion because she was "difficult to work with," Def. 56.1 Stmt. at ¶ 12, "griped about office procedures," *id.* at ¶ 14, and failed to get along with her co-workers, *see id.* at ¶ 17. However, NCA has not specifically articulated that such behavior was the basis for its decision. Nor does NCA's legal argument depend on the assumption of such facts, as it does with respect to the issue of Marks's physical appearance. *Cf. supra* at 13–14 (recognizing that defendant's assumption, for the purposes of its motion, that Marks was not hired because she was overweight is consistent with the substance of its legal argument). Consequently, this Court will not consider this justification in satisfaction of NCA's second-stage burden.

13. Plaintiff argues that *Fisher I* is distinguishable from the case at bar because, unlike the plaintiff in *Fisher I,* "who asked the court to infer discrimination against married females *entirely* from statistical evidence," Pl. Mem. at 7 n. 2 (emphasis added) (citing *Fisher I,* 70 F.3d at 1426–27, 1447), Marks has offered "direct evidence of discrimination, *i.e.,* the admissions of her supervisors that NCA's refusal to promote her was based on weight." This argument, however, is flawed for two reasons. First, the plaintiff's case in *Fisher I* was not based solely on statistics; it also relied on anecdotal evidence, similar to Marks's, including statements by the plaintiff's co-workers. *See Fisher I,* 70 F.3d at 1438–41. Second, contrary to Marks's claim, she has not demonstrated any evidence that gender played a role in NCA's decision. *See infra* at 16–22.

effect, Marks is attacking the credibility of Schoenfeld's "evasive declaration," which her attorneys term a "sweeping statement [that] is, on its face, unbelievable." *Id.* Toward that end, Marks points to her own testimony that she saw overweight salesmen "walking around," Marks Dep. at 63, but never observed any "heavier saleswomen," *id.* In fact, according to her, "all of the saleswomen were thin, cute and adorable." *Id.* at 63–64. Marks also testified that she had conversations with a number of salespersons at the Christmas party regarding their incomes. *See id.* at 163–64.

Conflicting testimony of this sort may render summary judgment inappropriate if determination of "the issues involved will depend on the credibility of the witnesses." 10A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice & Procedure* § 2726, at 447 (1998); *see also Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."); *Agosto v. INS*, 436 U.S. 748, 756, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978) ("[A] district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented."); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir.1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment"). However, the nonmovant cannot survive summary judgment simply by asserting that a potential witness's credibility is at issue. Rather, to "put credibility in issue so as to preclude summary judgment," the nonmovant must produce "specific facts" that demonstrate an actual inconsistency. Wright et al., *supra*, § 2726, at 445. Hence, Marks "cannot rest on the allegations of the complaint but must adduce factual material which raises a substantial question of the veracity or completeness of the movant's showing or presents countervailing facts." *Beal v. Lindsay*, 468 F.2d 287, 291 (2d Cir.1972).

Marks's assertions do not suffice to place Schoenberg's credibility at issue and thereby do not raise a "genuine issue of material fact." First, Marks's own testimony is insufficiently specific as to the existence of overweight men in the sales department. Marks cannot name or otherwise identify a single overweight male sales representative. *See* Marks Dep. at 63. In fact, contrary to the assertions in her memorandum of law, *see* Pl. Mem. at 6, Marks never even testified that she actually saw any overweight male sales representatives, although the Court will infer such an allegation from her motion papers.[14] Nevertheless, this bare asser-

---

**14.** Marks's memorandum of law insists that, at her deposition, "plaintiff definitely identified overweight men she observed in the area of the NCA sales division as individuals hired as sales representatives." Pl. Mem. at 6 (citing Marks Dep. at 63). In fact, the testimony cited in the brief does not in any way establish that fact. Rather, the testimony merely repeats Marks's allegation that NCA hired overweight men for sales positions without offering any personal knowledge of their existence or identity. *See* Marks Dep. at 63 ("Q: Is it accurate to say that you claim that overweight men were hired for sales? A: That's correct, some of the men were overweight."). When asked to identify specific men, however, she grew evasive.

Q: What men—

A: It didn't seem to matter if you were a man.

Q: What men are you referring to when you say that some of the men were overweight?

A: Again, I'm not that familiar with the name[s] of the sales [representatives], like I said to you before, it's a completely separate division. *I saw the salesmen walking around, I was not that familiar with names of that department.*

*Id.* (emphasis added). The above testimony establishes only that Marks was unfamiliar with the sales department, but had seen salesmen—not necessarily overweight salesmen, however—walking around the office. Never does she even state that she saw an overweight salesman. Her attorney did, however:

tion is woefully vague. *See Mellon Bank, N.A. v. United Bank Corp.*, 31 F.3d 113, 116 (2d Cir.1994) ("[A]mbiguity is not enough to preclude summary judgment."); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (" '[M]ere conclusory allegations or denials' in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist.") (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)); *Donnelly v. Guion*, 467 F.2d 290, 293 (2d Cir.1972) (holding that "vague and conclusory allegations, unsupported by evidence," do not adequately contest credibility for the purposes of Rule 56); *Valdes v. New York City Dep't of Environmental Protection*, No. 95 Civ. 10407, 1997 WL 666279, at *1 (S.D.N.Y. Oct.27, 1997) ("Allegations of such vague and isolated incidents, unsupported by any other admissible evidence, cannot support a discrimination claim."). Consequently, Marks's inability to identify any specific overweight male sales representatives leaves her incapable of establishing that she was "similarly situated in all material respects" to the male salesmen she claims were hired notwithstanding their weight. *See Shumway v. UPS*, 118 F.3d 60, 64 (2d Cir.1997). As such, she cannot meet her burden of demonstrating disparate treatment.

> Q: Do you know, other than seeing heavier men walking around in sales, do you know the names of any of these men?
> A: No, I do not. I don't recall.

*Id.* Unfortunately for Marks, an attorney's question does not constitute testimony.

However, the Court must resolve all ambiguities and draw all justifiable inferences in favor of plaintiff, the non-moving party. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Holt*, 95 F.3d at 129. Therefore, although Marks did not directly testify that she saw any overweight men, for the purposes of deciding this motion, the Court will infer that the salesmen Marks saw "walking around" were the overweight individuals to whom her counsel referred in her question.

At most, Marks has testified that she observed overweight men "walking around" whom she assumed were sales representatives. She cannot provide specific names, places, or dates. To rebut her vague assertion, Schoenberg explained that "[b]oth the hallways and the Christmas party are open to all employees, not just sales representatives," that "the Christmas party often includes some suppliers and friends of employees," and that "[s]ales representatives are only a small percentage of those in attendance." Schoenberg Decl. at ¶ 6. Marks has failed to offer any persuasive explanation with regard to how she could possibly know that the individuals she saw were sales representatives. Her argument that she "had no difficulty identifying particular men as sales representatives because ... she had spoken to three of the male sales representatives at the NCA [December 1993] Christmas party," Pl. Mem. at 6, rings hollow.

■ Second, in an apparent effort to manufacture a "genuine issue of material fact," Marks's attorneys have submitted articles about obesity found on various Web sites to refute Schoenberg's "sweeping statement" regarding the lack of overweight sales representatives at NCA. These articles establish that approximately 54 percent of Americans are overweight. Pl. Mem. at 6; Pl. 56.1 Stmt. at ¶ 26; Burleigh Decl. ¶ 4 & Ex. C.[15] Marks con-

15. Apparently though, according to one of the articles plaintiff's counsel submitted, different government agencies have failed to agree on a medical definition of "overweight." All acknowledge that a person's body mass index ("BMI"), a statistic that measures body weight in relation to height, and which is closely linked to a person's body fat, should be the determining factor. However, different officials have established different standards for determining whether an individual is "overweight"—ranging from a BMI of 25 to 28. *See How High Is Your BMI?*, Burleigh Decl., Ex. C at 2. An Internet user can calculate her BMI online at the *Body Mass Index Calculator* <http://www.kcnet.com/~marc/bmi.html> (last visited Oct. 18, 1999).

tends that this figure renders Schoenberg's declaration "unbelievable," in the absence of any reason why NCA sales representatives would escape the American propensity towards obesity, and particularly in light of NCA's denial of Marks's charges that it pursued a policy of refusing to hire overweight individuals as sales representatives.

The statistic, however, while disturbing, does not raise a "genuine issue of material fact" for the purposes of this motion. First and foremost, Marks has failed to demonstrate the statistical significance of this percentage because she has not established how many individuals make up NCA's sales force. The fewer in number the sales representatives, the less their uniform slenderness would constitute a statistical anomaly. *See Pollis v. New School for Social Research*, 132 F.3d 115, 121 (2d Cir.1997) ("The smaller the sample, the greater the likelihood that an observed pattern is attributable to other factors and accordingly the less persuasive the inference of discrimination to be drawn from it"). In addition, Marks cannot argue both sides of the same factual issue by relying on the accuracy of NCA's denial. Having throughout this litigation advanced

the theory that NCA refused to hire her on account of her weight, she cannot now deny the possibility that the lack of overweight sales representatives at NCA was due to some sort of weight-conscious hiring policy. Finally, it is not at all clear that either Schoenberg's statement or any NCA hiring policy defines "overweight" using the same standard as the studies discussed in the articles. As the articles recognize,[16] there is considerable debate in the medical community over the definition of the medical term "overweight;" surely lay persons would have similar difficulties agreeing upon such a standard. Regardless, Marks has offered no proof that Schoenberg's definition of "overweight" is in any way related to any of the standards mentioned in the articles.[17]

Accordingly, Marks is unable to show "specific facts" sufficient to render Schoenberg's credibility or the issue of whether NCA employed any overweight male sales representatives a "genuine issue of material fact." In the end, Marks's "gender plus" claims amount to nothing more than bald assertions that she was discriminated against on account of her weight, and discrimination based on weight alone is not illegal under Title VII.[18] "To be actionable,

---

**16.** *See supra* note 15.

**17.** For example, using a standard under which a person with a BMI above 25 is "overweight," as endorsed by one of the articles, a person who is "5-foot-4, 145 pounds or 5-foot-10, 174 pounds" is considered "overweight." *How High Is Your BMI?*, *supra*, at 2. It is certainly possible, if not probable, that Schoenberg or other NCA hiring officials might not have considered such individuals to have been "overweight" for the purposes of its selection process. Again, however, Marks has made no showing that Schoenberg's definition of "overweight" relates to this or any other medical standard.

**18.** In general, "while a cause of action may lie against an employer who discriminates against an employee on the basis of the perception that the employee is morbidly obese, *see Cook v. Rhode Island Dep't of Mental Health, Retardation, & Hosps.*, 10 F.3d 17, 25 (1st Cir.1993), or suffers from a weight condition that is the symptom of a physiological disorder, *see* 29 C.F.R. § 1630.2(h), no cause

of action lies against an employer [under the ADA or the Federal Rehabilitation Act of 1973] who simply disciplines an employee for not meeting certain weight guidelines." *Francis*, 129 F.3d at 286 (2d Cir.1997); *see also Ellis v. United Airlines, Inc.*, 73 F.3d 999 (10th Cir.1996) (affirming district court's decision that airline's weight restrictions do not violate the Age Discrimination in Employment Act); *Hazeldine v. Beverage Media, Ltd.*, 954 F.Supp. 697, 703–05 (S.D.N.Y.1997) (granting summary judgment against plaintiff claiming discrimination based on her morbid obesity because she had not presented sufficient evidence to allow a reasonable jury to find that she was disabled under the ADA); *Murray v. John D. Archbold Memorial Hosp., Inc.*, 50 F.Supp.2d 1368, 1379, 1381–82 (M.D.Ga.1999) (holding that employer's weight policy did not constitute unlawful inquiry pursuant to the ADA and its application was not racially selective). Again, because Marks has abandoned her ADA claims, *see supra* note 2, the Court will not consider their viability.

gender-plus discrimination must be premised on gender." *Coleman v. B–G Maintenance Mgmt.*, 108 F.3d 1199, 1203 (10th Cir.1997); *see also Malarkey*, 704 F.2d at 674 (dismissing complaint for failure to state a cause of action because plaintiff did not allege disparate treatment among male and female employees). Because Marks has shown no connection between NCA's failure to promote her and her gender, nor any evidence of disparate weight policies for men and women, her "gender plus" claims must fail.

### III. Plaintiff's Retaliation Claims

Plaintiff also claims that she was terminated from her position as a telemarketer in retaliation for complaining about gender discrimination. *See* Am. Compl. at ¶¶ 33–43, 46–47, 54–55, 62–63. Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). In order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must show "(1) participation in a protected activity that is known to the defendant, (2) an employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse decision." *Richardson*, 180 F.3d at 443 (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir.1996)). NCA contends that it is entitled to summary judgment on Marks's retaliation claims because: (1) "there is no evidence that Marks complained about gender discrimination before she was sent home or that her supervisors understood or reasonably could have understood that Marks had complained about gender discrimination;" and (2) "Marks was not discharged against her will, but chose to leave NCA." Def. Mem. at 12–13.

### A. Plaintiff's Complaints to Her Supervisors Did Not Raise the Issue of Gender Discrimination

Marks cannot meet her burden on the first element of a *prima facie* claim of retaliation because there is no evidence that she ever complained about gender discrimination before leaving NCA, and thus no way that NCA could have understood her complaints to be gender-based. To prove that she engaged in protected activity by opposing a practice forbidden by Title VII, Marks must show that she had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan v. Columbia Univ. College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988). The reasonableness of plaintiff's belief must be assessed "in light of the totality of the circumstances." *Galdieri–Ambrosini*, 136 F.3d at 292. The conduct complained of need not necessarily be illegal, so long as the employee reasonably believed at the time of the complaint that a violation of the anti-discrimination laws had occurred. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.1998). Moreover, the employer had to have been aware of the complaint and must have "understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri–Ambrosini*, 136 F.3d at 292.

The record plainly contradicts Marks's contention that she had a good faith belief that NCA's employment practices were unlawful. First, for the reasons discussed above, *see supra* at 11–21, there was "no semblance of gender-oriented motivation in the events or conversations" Marks has described. *Galdieri–Ambrosini*, 136 F.3d at 292. Second, at the time she complained to her supervisors, Marks had yet to allege any discrimination based on gender or any other Title VII violation. Marks has testified that she protested to McGuire and Chase that the decision to promote Thomas over her was "justly unfair" because she was such an effective

telemarketer. Marks Dep. at 160–61. She also stated that she had complained to co-workers about "discrimination due to the weight." *Id.* at 69. But there is no evidence that Marks ever once suggested, before her employment was terminated, that NCA's decision not to promote her had anything to do with her gender. *See, e.g., Brands–Kousaros v. Banco Di Napoli S.P.A.,* No. 97 Civ. 1673, 1997 WL 790748 (S.D.N.Y. Dec. 23, 1997) ("[T]he protected activity must involve some sort of complaint about a type of discrimination that Title VII forbids").

Perhaps the best evidence of Marks's state of mind at the time of her complaints is the transcript of her telephone call with co-worker John Reynolds the day she was sent home from work. During that conversation, Marks told Reynolds,

> [B]etween you and [me], I spoke to already my cousin, who is an attorney, [and] he said I definitely have a lawsuit. Never mind, you know that whole thing with [Thomas] which my mother had told me she would have done something about it anyway? You know [Thomas] being promoted and not me? Because of her elbowing in. *I can claim discrimination on that. I never realized it. But I just spoke to the attorney about it.* Discrimination doesn't have to be black and white, I never knew that people have won based on weight, that you can actually use that, that you can't hire someone just because they are thinner.

Reynolds Tape Tr. at 9 (emphasis added). This comment disproves Marks's assertion in two different ways. First, it shows that even after she had left NCA, never to return, her complaints were based solely on a theory of "weight discrimination." She did not mention any connection whatsoever to her gender. Second, her statement acknowledges that she "just spoke to the attorney" after leaving work, and that before that consultation, she "never realized" that she had a discrimination claim. This admission belies her argument that

her grievances referred to NCA's violation of federal antidiscrimination laws despite not using "magic words" such as "sexual," "gender," or "sex plus discrimination." Pl. Mem. at 12. She never knew she had a discrimination claim, let alone a claim for gender discrimination. Thus, if anything, she complained of injustice, unfairness, and perhaps weight discrimination, though prior to her conversation with the attorney, it appears that she never thought any of these were illegal.

Marks's situation is strikingly similar to *Galdieri–Ambrosini,* 136 F.3d at 292, in which the Second Circuit held that a disgruntled secretary's retaliation claims were insufficient as a matter of law. First, as in *Galdieri–Ambrosini,* there is no evidence that Marks's belief that "she was being discriminated against because she was a woman—even if genuine—was reasonable." *Id.* Having recognized that Marks's "gender plus" claims have no merit, the Court cannot find that her belief in the validity of such a claim would have been reasonable at the time. Second, Marks's complaints about alleged discriminatory practices were similar to Galdieri–Ambrosini's in that both claimed that the unfair treatment they received was grounded in sexual stereotypes. Marks maintains that NCA's requirement that sales representatives be "thin and cute" "impl[ied] a broader critique of a stereotyped focus on physical appearance whe[re] female employees in positions of importance [we]re concerned." Pl. Mem. at 13. This allegation is analogous to Galdieri–Ambrosini's contention that certain tasks assigned to her were "women's work" because they were "traditionally secretarial tasks" that were often "related to the employer's personal business." *Galdieri–Ambrosini,* 136 F.3d at 290. The Second Circuit found that Galdieri–Ambrosini's objections to being instructed to work on her boss's personal matters could not reasonably have been construed as gender-based complaints because they never "averted to gender as a basis for

[her boss's] assignments" nor did she ever "protest[ ] that the requirement was gender-based." *Id.* at 292. Similarly, because Marks failed to couch her complaint in terms of gender discrimination, "there was nothing in [Marks's] protests that could reasonably have led [NCA] to understand that [gender] was the nature of her objections." *Id.*

Marks's attempt to distinguish her case from *Galdieri–Ambrosini* is unconvincing. She maintains that NCA cannot justify its criteria of "thinness and cuteness" for sales representatives as a "normal" or "traditional" requirement for such employees. *Cf. id.* at 292 (finding no semblance of gender discrimination because "virtually all of the tasks [Galdieri–Ambrosini] was assigned are tasks that are normally performed by secretaries"). However, as discussed above, there exists no credible evidence that NCA judged male sales representatives any differently than their female counterparts. Consequently, it is apparent that, assuming NCA utilized any weight criteria, such criteria were applied even-handedly and without regard to gender. Moreover, NCA's rationale for employing a slim and attractive sales force is obvious, certainly normal in the industry, and, in all probability, a long-established tradition. In fact, Marks, in her own words, related Chase's explanation: "[L]os[ing] the weight ... was important for outside sales because you were—you weren't just on the telephone, you were going around from person to person and therefore presentation was extremely important." Marks Dep. at 161.

Accordingly, because Marks has not shown that her complaints in any way related to gender, there is no way NCA could have known of the nature of such allegations. As a result, Marks has failed to establish the first element of a *prima facie* case of retaliation under Title VII.

**B. NCA's Decision to Discharge Plaintiff Was Not an Adverse Employment Decision**

 Even if Marks could show that her grievances were gender-based, she cannot maintain a claim of retaliatory discharge because she was not disadvantaged by NCA's employment decision. A plaintiff may establish this second element of her *prima facie* case by demonstrating either "actual" or "constructive" discharge. In an actual discharge, the plaintiff's employment is terminated against her will. *See Chertkova v. Connecticut General Life Ins. Co.,* 92 F.3d 81, 88 (2d Cir.1996). In contrast, if the employee is forced to resign due to intolerable working conditions, she may have suffered a constructive discharge. *See id.* at 89.

**1. *Actual Discharge***

Although she was formally fired, Marks's complaint "misrepresents the factual circumstances surrounding her departure and has failed to satisfy her burden of establishing a credible *prima facie* case of retaliation." *Gutierrez v. Henoch,* 998 F.Supp. 329, 336 (S.D.N.Y.1998). Contrary to her assertions, NCA did not make "an employment decision or action disadvantaging [her]," as Marks must prove to establish a *prima facie* case. *Richardson,* 180 F.3d at 443

 It is indeed undisputed that NCA did discharge Marks in the wake of its attempt to suspend her without pay for one week. *See* Pl. Mem. at 9. The transcript of the taped conversation between Marks and Chase, however, illuminates the true circumstances and motivations behind NCA's action. The transcript shows that plaintiff *asked* to be fired to avoid a suspension because she wanted to leave NCA and, as a result, collect unemployment benefits. A few excerpts from the transcript clearly illustrate that the so-called "firing" was intended to benefit—not disadvantage—the plaintiff. For example, at the beginning of the conversation, Chase told Marks that, following her suspension, "[i]f everything goes well then you [can] continue to work here." Chase Tape Tr. at 1. Yet Marks replied,

OK, the bottom line is that I would rather be fired[.] I cannot afford ... not to work for a week, I was out last month for weeks[.] I was honestly ill with the flu OK and that killed me financially OK[.] I honestly cannot afford, I mean, not to work for a week, at least if I'm fired I get—I can collect—I am not in that type of financial position. I'm moving, OK, I need the money for that which is quite expensive ....

*Id.* Later in the call, Chase informed Marks that she could either accept her suspension or voluntarily resign. *See id.* at 17. Marks reiterated that she could not afford a week without pay, and reminded Chase that he had the right to fire her. *See id.; see also id.* ("Well I would rather then be fired because I cannot afford a week ....,."). Chase acknowledged that McGuire had given him permission to fire her, but stated unequivocally: "I *don't* choose to fire you, I choose to suspend you." *Id.* (emphasis added). The two went back and forth, with Marks begging to be fired and Chase maintaining that he wanted her to stay with NCA:

DM: Alright then I would like to be fired.

SC: I don't have, I'm not giving you that option.

DM: You said that Richie [McGuire] gave you the option to fire [me] or to suspend me.

SC: But I don't want to fire you Debbie.

DM: Because you don't want to pay unemployment.

SC: Why is that, how is that going to bother me you haven't been here long enough to make a significant impact.

DM: Yes I have ....

SC: Debbie, why do you want to leave and get pennies when I can give you ....

DM: Because I can not afford to be out of work for a week, I can not afford it ....

SC: Debbie, I understand your position.

DM: OK in my building, in my building.

SC: Debbie, you have to learn when to stop talking, you better learn when to stop talking Debbie, because you're getting real close to me making the final decision that I don't want to make unnecessarily. So listen, hang on one, hang on one second I got to talk to someone. [Pause.] Debbie?

DM: Yes.

SC: You're fired.

DM: OK.

SC: Goodbye.

*Id.* at 18–19. Before Chase hung up, Marks remarked that she preferred to be fired because she could make more money on unemployment than she could as a telemarketer. *See id.* at 20.

Marks's allegation that she was discharged against her will is clearly belied by this transcript. Marks cannot dispute that Chase only terminated her employment because she so persistently requested, if not insisted, that he do so. *Cf. Maldonado v. Esmor Correctional Servs., Inc.,* No. 97 Civ. 7087, 1998 WL 516118, at *1 (S.D.N.Y. Aug.19, 1998) (denying summary judgment because plaintiff disputed "whether [she] asked Esmor to terminate her so that she could receive unemployment benefits"); *see also Erit v. Judge, Inc.,* 961 F.Supp. 774, 776 n. 2 (D.N.J. 1997) (recognizing dispute between parties over whether plaintiff asked to be terminated, but holding that the dispute was not material for the purposes of the instant motion). Although NCA formally discharged Marks to satisfy her desire to collect unemployment, in effect, her departure was completely voluntary. *Cf. Delgado v. Morse Indus. Corp.,* No. 85 C 224, 1986 WL 3309 (N.D.Ill. Mar.7, 1986) (ruling that plaintiff's separation from employment did not violate ERISA because plaintiff asked his supervisor to fire him so that he could collect unemployment insurance).

Having begged for the firing, Marks may not now claim that the decision was, under the circumstances, adverse to her interests.[19] As such, she cannot establish that she was actually discharged.

### 2. Constructive Discharge

■ Alternatively, Marks argues that if she was not actually discharged by NCA, she was constructively discharged. "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Chertkova*, 92 F.3d at 89. A work atmosphere is "intolerable" if conditions are " 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " *Id.* (quoting *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir.1987)).

■ Marks has failed to demonstrate that a reasonable person in her circumstances would have felt compelled to quit. *See Castaldo v. New York City Board of Educ.*, 166 F.3d 1199, 1998 WL 777038, at *1 (2nd Cir. Oct.27, 1998); *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir.1993). For one thing, no one at NCA ever suggested to Marks that she quit. *See, e.g., Lopez*, 831 F.2d at 1186. Rather, Chase urged her to accept the suspension and return to work, despite the numerous distractions she had engendered. Nor is it sufficient for Marks to claim that her personality conflict with her supervisors rendered working conditions merely difficult or unpleasant. *See, e.g., Martin v. Citibank, N.A.*, 762 F.2d 212, 221 (2d Cir. 1985). Finally, Marks has offered no evidence that she was ridiculed or even criticized for being overweight. *See, e.g., Chertkova*, 92 F.3d at 89. A mere one week suspension—which Marks has not demonstrated was unjustified—does not constitute an "intolerable" work condition that would compel a reasonable person to resign. Consequently, Marks cannot establish constructive discharge either.

### IV. Plaintiff's State Law Claims

■ Marks's pendent state law claims must also be dismissed. First, the Court notes that "[t]he standards for recovery under section 296 of the Executive Law are in accord with the Federal standards under [T]itle VII of the Civil Rights Act of 1964." *Ferrante v. American Lung Ass'n*, 90 N.Y.2d 623, 665 N.Y.S.2d 25, 687 N.E.2d 1308, 1311 (1997); *see also Bond v. Sterling, Inc.*, 997 F.Supp. 306, 309 n. 1 (N.D.N.Y.1998). Therefore, because Marks's "gender plus" claim fails as a matter of law under Title VII, it is most likely also deficient under N.Y. Exec. Law § 296.

■ In any event, because all of Marks's federal claims have been dismissed, and because the allegations in the complaint do not establish diversity jurisdiction,[20] there is no independent basis for jurisdiction over Marks's pendent state law claims. Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. The court, in its discretion, must "weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants." *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir.1994). " [I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness and comity—will point toward de-

---

**19.** Plaintiff has apparently developed her argument rather recently. In a conference before Magistrate Judge Katz on January 22, 1998, Marks's counsel, Mr. Samuel A. Abady, Esq., acknowledged that Marks had "[f]orcibly resigned." Jan. 22, 1998 Conference Tr. at 10.

**20.** Because Marks is a citizen of New York, *see* Am. Compl. at ¶ 1, and NCA is a New York corporation, which maintains its principal place of business in New York, *see id.* at ¶ 2, diversity is lacking. *See* 28 U.S.C. § 1332(a).

clining jurisdiction over the remaining state-law claims.'" *In re Merrill Lynch Limited Partnerships Litigation,* 154 F.3d 56, 61 (2d Cir.1998) (quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)); *see also Castellano v. Board of Trustees of Police Officers' Variable Supps. Fund,* 937 F.2d 752, 758 (2d Cir.1991). Consequently, the Court declines to exercise pendent jurisdiction over the remaining state law claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Women in City Gov't United v. City of New York,* 563 F.2d 537, 541 (2d Cir.1977). They shall be dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is HEREBY GRANTED. Plaintiff's disability and Title VII claims (*i.e.,* first, second, third, fourth, seventh, eighth, eleventh, and twelfth causes of action) shall be dismissed with prejudice. Plaintiff's remaining claims under New York State and New York City law (*i.e.,* fifth, sixth, ninth, tenth, and thirteenth causes of action) shall be dismissed without prejudice. The Clerk of the Court shall enter judgment dismissing the complaint in its entirety. **SO ORDERED.**